Peter Elmer DOWDLE, Appellant,

v.

The STATE of Texas.

No. 317–99.

Court of Criminal Appeals of Texas, En Banc.

Feb. 9, 2000.

Mark Stevens, San Antonio, for appellant.

Barbara Hervey, Asst. Dist. Atty., San Antonio, for State.

## *O P I N I O N*

MEYERS, J., delivered the opinion of the Court, joined by McCORMICK, P.J., MANSFIELD, KELLER, PRICE, HOLLAND, WOMACK and KEASLER, JJ.

Appellant was convicted of engaging in organized criminal activity in violation of

Penal Code § 71.02. He was sentenced to twenty-five years confinement and the trial court entered a deadly weapon finding. The Court of Appeals reformed the judgment to delete the deadly weapon finding. *Dowdle v. State,* No. 07–97–0264–CR slip op., 1998 WL 764691 (Tex.App.—Amarillo Nov. 3, 1998)(designated do not publish). We granted the State's petition for discretionary review to assess the Court of Appeals' conclusion that the evidence was legally insufficient to sustain a finding that appellant knew his co-defendant would use or exhibit a deadly weapon during the commission of the offense.

Following are the facts as set out by the Court of Appeals:

At around 11:30 p.m., on the evening of January 14, 1995, appellant walked from his apartment to the apartment of Jonathan Moore, a friend, hoping to get a ride to another friend's apartment. Meredith Nichols and Paul Cameron, friends of both appellant and Moore, were present at Moore's apartment when appellant arrived. The four teenagers sat around the apartment for several hours before Moore asked the three others if they would help him do a favor for Andrea Braden, a friend, by going to the house of her father, William Braden, and getting some of her "stuff."[ ]

Appellant testified that he was hesitant to help Moore because he knew Moore as a thief who had committed several burglaries in the past. However, because Moore assured appellant that Andrea had given him consent, and because appellant believed he could get a ride from Moore if he went along, appellant joined the three others.

Despite appellant's testimony that he neither intended to, nor did he believe that he was going to, commit a burglary, appellant suggested that they go by his apartment and pick up some Halloween masks so that if anyone saw them they would not be recognized. After picking up the masks, the four teenagers drove in Nichols's Bronco to an Albertson's grocery store where appellant and Cameron purchased two pairs of gloves.

During the early morning hours of January 15, 1995, the four then drove to the residence of William Braden, circling the block several times. After circling the block, Nichols dropped appellant, Moore and Cameron off down the street from the Braden residence and returned to the Albertson's to telephone the target residence. With knowledge that the occupants were out of town, and that the sliding glass door at the back of the residence would be open so the family dog could enter and exit the house, the three males, dawning [sic] masks and gloves, waited in the darkness behind the residence.

After listening to the phone ring repeatedly without being answered, Moore, Cameron and appellant entered through the open sliding glass door, maced the dog and answered the phone. They kept Nichols on the telephone line until they gathered up a television, a VCR, a pair of binoculars, a compound bow, numerous firearms and two coin jars, and then instructed Nichols to return and pick them up. After Nichols picked them up, the four circled the block and, after folding down the back seat, returned to the Braden residence and loaded the items they had collected into the Bronco.

They then drove to appellant's apartment where they unloaded everything except the television and the VCR into appellant's closet. Nichols then dropped Moore, Cameron and appellant off at appellant's father's house where appellant obtained a car. Nichols then drove to her apartment while Moore, Cameron and appellant returned to the Braden residence in appellant's car.

Once back at the Braden residence, appellant backed his car into the driveway, unlocked the trunk and sat in the driver's seat with the doors open as Moore and Cameron reentered the house for a third time to gather addi-

tional items. As appellant sat waiting on his cohorts, Fabian Dominguez, an off-duty San Antonio police officer, on his way home from work, drove down the street. The officer slowed as he passed the driveway to the Braden residence and apparently spotted Moore and Cameron coming out of the house carrying various items including several firearms. Officer Dominguez stopped his car and quickly reversed to a position blocking appellant's vehicle in the driveway. On observing the officer, Moore and Cameron dropped what they were carrying and piled into appellant's car, yelling for appellant to go. However, when officer Dominguez, wearing a police uniform, drew his service weapon and ordered appellant to shut the car off, appellant complied.

Officer Dominguez approached the passenger side of appellant's vehicle and instructed appellant to hand him the keys. Appellant complied with officer Dominguez's instructions and handed the keys to the officer through the open passenger side window. As the officer stood on the passenger side of the car pointing his service weapon through the open window of the car, Moore, who was seated in the passenger seat, shot the officer point blank through the right eye with a .25 caliber Lorcin revolver.

Officer Dominguez fell immediately to the ground, dropping his service weapon onto the passenger floorboard of appellant's car. Moore then stepped out to retrieve the keys and shot officer Dominguez three more times in the head at close range with the officer's .40 caliber Glock semiautomatic. The three teenagers then sped off, met back up with Nichols, switched cars, gathered together all the items taken from the Braden

residence, and drove out to an isolated area near Bandera where they unloaded and hid everything in a brushy area off a gravel road, including the .25 and .40 caliber handguns used to kill officer Dominguez.

*Id.* at 2–5.

██ Appellant complained on appeal that the evidence was legally insufficient to prove he knew Moore would use or exhibit a deadly weapon. Based on appellant's uncontradicted testimony that he did not know Moore had possession of a gun preceding or during the burglary and that he first saw the gun on the passenger floorboard after Officer Dominguez had been shot, the Court of Appeals concluded there was "no evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that appellant knew Moore would use or exhibit a deadly weapon." *Id.* at 17–18. The State argues the Court of Appeals erred by viewing the evidence as if the offense committed was burglary rather than the charged offense of engaging in organized criminal activity.[1]

██ The Court of Appeals correctly stated that in order to sustain the deadly weapon finding against appellant, as a party to the offense, the State had to prove appellant knew a deadly weapon would be used or exhibited by Moore "during the commission of the offense or during the immediate flight therefrom." *Dowdle,* slip op. at 16–17. Appellant was charged with Engaging in Organized Criminal Activity under Penal Code section 71.02, which provides in relevant part:

A person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires

1. We granted review of the State's four grounds for review. The first three grounds pertain to the State's argument that the Court of Appeals improperly viewed the evidence as if the offense committed was burglary. The State's fourth ground for review pertains to the Court of Appeals' holding that the firearms stolen in the burglary could not be "used or exhibited to facilitate the commission of" the crime because they were "fruits" of the crime. We resolve this case based on the first three of the State's grounds and therefore dismiss the fourth ground without prejudice.

to commit one or more [enumerated offenses, including burglary].

"Combination" is defined as "three or more persons who collaborate in carrying on criminal activities." Tex. Penal Code § 71.01(a). To establish participation in a combination, the State must prove "that the appellant intended to 'establish, maintain, or participate in' a group of three or more, in which the members intend to work together in a continuing course of criminal activities." [2] *Nguyen v. State,* 1 S.W.3d 694, 697 (Tex.Crim.App.1999). These activities need not, individually, be criminal offenses. *Id.*

The State is correct in pointing out that the Court of Appeals' sufficiency analysis seems to assume the charged offense was burglary which ended with the shooting:

> Appellant's uncontradicted testimony at trial was that he had no knowledge that Moore had a gun on him *during the burglary;* during the time they were together *preceding the burglary,* he never saw Moore in possession of the gun and he never heard Moore make reference to it. Appellant testified that he saw the gun for the first time on the passenger floorboard of the car after officer Dominguez had been shot.... Viewing the totality of this evidence in the light most favorable to the verdict, there is simply no evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that appellant knew Moore would use or exhibit a deadly weapon.

*Dowdle,* slip op. at 17–18 (emphasis added). The Court of Appeals' analysis does not take into account the co-conspirators' activities following the shooting. The "continuing course of criminal activities" engaged in by appellant and the co-conspirators did not end with the shooting.

The co-conspirators fled the scene, regrouped to discuss what their plan of action would be, combined the separate loads of stolen property and traveled to another county to secrete the stolen property and the officer's gun. Following is an excerpt from appellant's confession, describing what happened after leaving the scene of the shooting:

> ... I saw that Jonathan had the officers [sic] gun on the front floor boards of the car. We were trying to find a place to go so that we could talk and think about what to do, and what we should do with the officers [sic] gun. I drove to Jonathan's apartment and we went inside and told Meredith what happened.

> We talked about what to do and we decided to get rid of everything. That's when me and Jonathan went in my car to the Albertsons.... When we got to the Albertsons there weren't very many people so we took everything out of my car and put it in Pauls [sic] car.

> Then went back to Jonathan's apartment and I dropped him off there. Then Paul followed me to my apartment and parked his car there. I parked my car away from the apartment. We went in my apartment and we got all the stuff out of my apartment that we put there earlier and put it in Pauls [sic] car. Then Jonathan and Meredith showed up and I was with Paul in his car and we followed them out to some neighborhood off of Bandera Rd. It was out past Helotes before you get into Bandera.

> We drove out there and parked and we got all the stuff and followed Jonathan down this path into the woods. We took all the stuff and hid it behind some trees. It was a bunch of guns, a T.V., a VCR, some bow and arrow stuff and

---

**2.** The indictment in the instant case alleges in relevant part that appellant and his three co-conspirators:

> did then and there, with the intent to establish, maintain and participate in a combination and in the profits of a combination, conspire and agree to commit and committed the offense of burglary of a habitation....

The indictment further alleges that "in pursuance" of the conspiracy, the co-conspirators "performed [certain] overt acts[,]" including transporting the stolen property to a location in Bandera County.

everything else. That's where the officers [sic] gun was taken to also.

After we dumped off the stuff we went back to San Antonio....

The evidence also reflects that Moore's gun was deposited with the stolen property in Bandera. Clearly, appellant's participation in organized criminal activities was not over when the officer was shot. Once Moore shot the officer, appellant had knowledge that Moore was carrying a gun throughout the continuing course of criminal activities following the shooting. The further question is whether Moore "used" the gun in the activities following the shooting, even though he did not fire it again.

■ Possession of a firearm may be sufficient to constitute "use." In *Patterson v. State*, 769 S.W.2d 938 (Tex.Crim.App. 1989), we examined the meaning of the terms "used" or "exhibited" in the context of a deadly weapon finding. There, in executing a search warrant, police officers entered an apartment where there was suspected drug dealing. The defendant was seated on a sofa in the living room when the officers entered. On a table next to the defendant were money and illegal drugs. A gun was wedged between the defendant's leg and the end of the sofa. The defendant was convicted of illegal possession and an affirmative finding was entered. We granted review of the Court of Appeals' decision that "use" means "*any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Id.* at 939. We expressly approved the appellate court's definition:

Thus, "used ... a deadly weapon" during the commission of the offense means that the deadly weapon was employed or utilized in order to achieve its purpose. Whereas "exhibited a deadly weapon"

means that the weapon was consciously shown or displayed during the commission of the offense. Therefore, the court of appeals was correct when it stated that " 'used ... during the commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends as well to any employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony." *Patterson v. State*, supra [723 S.W.2d 308], at 315 [Tex. App.–Austin 1987].

*Id.* at 941.

We recently relied on *Patterson* to hold the evidence was legally sufficient to support a finding that a defendant "used" firearms in committing the offense of illegal possession, where the firearms were located in the same closet where the police discovered a substantial amount of marijuana and cash. *Gale v. State*, 998 S.W.2d 221 (Tex.Crim.App.1999). Based on the fact that the guns were in the same closet as the contraband and proceeds, and the fact that the amount of contraband exceeded an amount consistent with private recreational use (over twenty pounds of marijuana, divided into distribution-sized packages), we held a rational trier of fact could conclude the firearms were "used" to facilitate the illegal possession.[3]

In neither *Patterson* nor *Gale*, did the gun incidentally happen to be in close proximity to the defendant or the contraband for a reason unrelated to facilitating the crime. The guns were deliberately placed in a particular location for convenient access by the defendant, for the specific purpose of assisting the defendant in ensuring unimpeded commission of the offense. The guns' availability and ready access to the defendants was key. In this sense, the defendants were "armed" or

---

**3.** We have also suggested that showing a deadly weapon to an accomplice may be sufficient to constitute "use" of the weapon. *Whatley v. State*, 946 S.W.2d 73, (Tex.Crim. App.1997) ("merely exhibiting a deadly weap- on to an accomplice during a solicitation transaction may be sufficient to support a deadly weapon finding—especially where, as in the present case, the weapons were deadly weapons per se").

made sure they could be "armed" quickly if necessary.

In the instant case, Moore shot and killed Officer Dominguez when the officer attempted to interfere with the commission of the burglary. The gun did not just happen to be in the car for some reason unrelated to the criminal activities. Moore had deliberately armed himself for the purpose of using the weapon if necessary in order to accomplish the burglary and the commission of other related criminal activities. The fact that Moore had armed himself was made known to his co-conspirators with the shooting. Moore's lack of reservation in firing to stop any interference with commission of the criminal objective was clear from the manner in which he killed the officer. Moore shot the officer point blank in the face as the officer looked into the passenger's side window. Then Moore got out of the car and shot the officer three more times. Based on these circumstances, a trier of fact could rationally conclude appellant knew of Moore's intention to "use" the weapon during the continuing course of criminal activities.[4] The Court of Appeals erred by failing to consider appellant's knowledge of Moore's use of the firearm during the continuing course of criminal activities following the shooting.

Appellant also claimed before the Court of Appeals that the evidence was factually insufficient to sustain the deadly weapon finding, but the Court of Appeals held that because of its disposition based on appellant's legal insufficiency argument, it did not need to address the contention as to factual sufficiency. *Dowdle*, slip op. at 18. That portion of the judgment of the Court of Appeals deleting the affirmative finding based on legal insufficiency is vacated and this cause is remanded to that Court to consider appellant's sixth point of error regarding factual sufficiency to support the deadly weapon finding.

JOHNSON, J., filed a dissenting opinion.

JOHNSON, Judge, dissenting.

I respectfully dissent.

The majority concedes that "[i]f, after the shooting, appellant had stepped out of the car, walked away and turned himself in, then the evidence would not support an affirmative finding because there is no evidence that he knew, *up to that point*, of the existence of a weapon in the possession of any of his co-conspirators." *Ante*, op. at 237 (emphasis in original). I agree. The necessary implication of this conclusion is that no deadly weapon finding is supportable until after the shooting. However, the majority's ultimate holding that a trier of fact could conclude that appellant knew of Moore's intention to use the weapon to facilitate the commission of the offense *after* the shooting is not supported by the record. In fact, there is no evidence in the record indicating where the gun was located from the time that appellant first saw it until the time that it was secreted in the woods with the stolen property.[1]

It is uncontroverted that appellant became aware of Moore's gun at the time that Moore shot the officer and first saw the gun on the floorboard of his car just after the shooting. However, the location of the gun during the time from immediately after appellant saw it up to the time when it was hidden in the woods is not in

---

4. Even assuming, *arguendo*, that appellant's participation in organized criminal activities had ended with the shooting, a deadly weapon finding may be made "when it is shown that a deadly weapon as defined in Section 1.07, Penal Code, was used or exhibited during the commission of a felony offense *or during immediate flight therefrom ....*" TEX. CODE CRIM. PROC. art. 42.12 § 3g(a)(2) (empha-

sis added). Thus, if a deadly weapon was "used" by Moore in the co-conspirators' "immediate flight" from the shooting and appellant knew about it, a deadly weapon finding was authorized.

1. The stolen property included the officer's gun.

evidence. Indeed, the gun could have been in any number of places. For example, after the shooting, appellant drove his car, in which Moore and Cameron were passengers, to Moore's apartment. All went inside. Where was the gun? After approximately 20 to 30 minutes, the three went to Albertson's, where they took "everything" out of appellant's car and put it in Cameron's car.[2] Where was the gun? Once the items were transferred from appellant's car to Cameron's car, appellant returned to Moore's apartment, where he dropped Moore off. Where was the gun? Appellant then went back to his own apartment.[3] He and Cameron stayed at appellant's apartment for about seven to ten minutes, during which time Moore and his girlfriend arrived. Where was the gun? Appellant then rode in Cameron's car, driven by Cameron, who followed Moore and his girlfriend in a Bronco, to a neighborhood where "all the stuff" was taken. Where was the gun? The answer to every question about the whereabouts of the gun is, we don't know.

The above demonstrates just a few of the innumerable possibilities of the whereabouts of Moore's gun; Moore's apartment, Moore's car, Cameron's car, appellant's car, Moore's person, Cameron's person, appellant's person, Moore's girlfriend's person. Its location simply cannot be established from the record. We know only that the gun was first seen at the time of the shooting and last seen abandoned with the stolen property. Any conclusion or assumption about its location at any other time is mere speculation. Without knowing its location, we cannot assess whether it was used to facilitate the offense.

Even assuming, *arguendo*, that evidence did establish one of the co-conspirators' *possession* of the gun after the shooting, there is no evidence in the record that the gun was *used* after the shooting or that it in some way facilitated the disposal of the stolen property. Mere possession of a weapon without utilizing it to achieve an intended result or purpose does not constitute the use of that weapon for the purposes of an affirmative finding. *See Ex parte Petty*, 833 S.W.2d 145 (Tex.Crim. App.1992); *Narron v. State*, 835 S.W.2d 642, 644 (Tex.Crim.App.1992); *Patterson v. State*, 769 S.W.2d 938, 941 (Tex.Crim. App.1989). However, possession of a firearm may be sufficient to constitute use *if such possession facilitates the associated felony*. *Patterson*, 769 S.W.2d at 939–41 (emphasis added).

The majority correctly notes that in *Gale* we found that a defendant "used" firearms to facilitate the illegal possession of marijuana and cash, where the firearms were located in the same closet where the police discovered a substantial amount of marijuana and cash. *Ante*, op. at 237, citing *Gale v. State*, 998 S.W.2d 221 (Tex. Crim.App.1999). However, the majority failed to acknowledge significant distinctions.

In *Gale*, uncontroverted testimony evidenced that drug traffickers use firearms to protect their drugs and drug proceeds.[4] *Gale*, 998 S.W.2d at 225. No testimony was presented in the instant case that those convicted of organized criminal activity frequently use firearms or deadly

---

**2.** It is unclear when and where Cameron got his car.

**3.** Although the record indicates Cameron followed appellant to his apartment, the record is unclear as to when Cameron began following appellant. He did, however, arrive at appellant's apartment in his car in which "everything" had been put.

**4.** The U.S. Supreme Court also notes that weapons are frequently associated with drug dealers. *See Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 504, 133 L.Ed.2d 472 (1995) ("A prosecution expert testified at trial that drug dealers frequently carry a firearm to protect their drugs and money as well as themselves.... The expert also testified that drug dealers generally use guns to protect themselves from other dealers, the police, and their own employees.")

**240**

weapons to facilitate their crimes.[5] Additionally, in *Gale*, evidence was introduced that the firearms could be "fully loaded and ready to fire within 'seconds.'" *Id.* In *the instant case*, however, not only is there no evidence as to whether the gun was loaded or could be fully loaded and ready to fire quickly, but the evidence does not even reveal if the gun could have been reached and fired by appellant or any co-conspirator. There is no evidence from which a rational trier of fact could have concluded beyond a reasonable doubt, or even reasonably infer, that Moore or any of the other participants exhibited or used a deadly weapon to facilitate the offense *after* the shooting.

Because I do not believe that, from the evidence in the record, a rational trier of fact could find beyond a reasonable doubt that appellant knew a deadly weapon would be used or exhibited by Moore or any other co-conspirator during the commission of the offense or during the immediate flight therefrom, I respectfully dissent.

---

**5.** Neither was there evidence presented that those convicted of burglary, the underlying offense, frequently use firearms or deadly weapons to facilitate their crimes.