Opinion issued February 10, 2005





     





In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00437-CR




SHAWN ANTHONY LEDET, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 184th District Court
Harris County, Texas
Trial Court Cause No. 917200




O P I N I O N
          Appellant, Shawn Anthony Ledet, was convicted by a jury of engaging in
organized criminal activity. The jury assessed appellant’s punishment at ten years’
confinement, suspended for ten years, community supervision, and a fine of
$5,895.47. The trial court ordered appellant to serve 180 days in the Harris County
Jail and to pay $400,000 in restitution to Texan Ford as a condition of his community
supervision. In four issues, appellant contends (1) that the evidence was legally
insufficient to support his conviction and (2) that the 180 days incarceration and the
restitution order were unconstitutional. We affirm.
Background
          In April 2001, Houston Police Officer Michael Ingels, assigned to the Auto
Theft Division, was contacted by a detective from Benbrook Police Department
regarding a stolen vehicle that had been placed for auction in Fort Worth. Prompted
by the information provided by the Benbrook police, Ingels and his partner, Officer
Joe Smith, discovered that Leona Chrichlow had sold the stolen vehicle to a Car Max
dealership in Houston. 
          Ingels and Smith went to the Car Max to review the sales records for the stolen
vehicle, as well as completed sales deals and attempted sales deals conducted in the
last name of Chrichlow. They discovered that Tamara Chrichlow (Chrichlow), Leona
Chrichlow’s daughter, had sold two other vehicles with altered vehicle identification
numbers (VINs) to Car Max. Ingels and Smith also discovered that Chrichlow was
attempting to sell a 2001 Ford Expedition to the Car Max. 
          Using the information provided by Car Max, Ingels went to Chrichlow’s
apartment. Chrichlow arrived at the apartment driving the Expedition she had
attempted to sell to the Car Max, but she left shortly after she arrived. When she left,
a marked Houston Police car pulled her over for a traffic violation. Chrichlow
presented proof of insurance, a Florida registration, and her driver’s license. Upon
looking at the Expedition’s VIN, Ingels believed it looked “bogus.” Based on this
belief, Ingels became suspicious that the vehicle was stolen; he had Chrichlow taken
into custody for possession of a stolen vehicle. After Chrichlow’s arrest, the
Expedition was searched. The search uncovered several pieces of mail from Texan
Ford regarding three vehicles other than the Expedition. 
          Ingels and Smith went to Texan Ford and contacted Hart Oshman, the General
Manager. Oshman pulled the sales records for the Expedition and the other three
vehicles. Ingels found that all four sales were conducted by the same salesman,
appellant. Ingels concluded that all four vehicles were stolen by identity theft. 
Oshman testified that, once he knew about the fraud relating to the first four vehicles,
he pulled the sales records for all of appellant’s sales deals. 
          Ingels discovered that a total of 19 vehicles (including the initial four) were
purchased using the names and credit information of people who never took
possession of the vehicles. All of the named purchasers had very high credit scores,
which Ingels stated was unusual. All but two of the purchasers had out-of-town
addresses, which was also unusual. Almost all of the vehicles were sold for the
manufacturer’s suggested retail price, which was also very rare. Most of the sales
deals included extended warranties, which was unusual. All of the sales deals were
conducted over a six-week period, and appellant was the salesman on each deal. In
all of the deals, the purchaser never came to the dealership. 
          Oshman testified that appellant had been a weak salesman until the middle of
February 2001, when his gross profits shot up dramatically. Appellant made
significant profits on each of the 19 sales deals conducted from the middle of
February until he was arrested in April. The gross profits were also unusually high
on each of the deals. None of the deals had a trade-in vehicle or money down, which
was unusual. Each sale was made off-site, which Oshman explained was very
unusual. Oshman testified that the approximate value of the vehicles sold was
$700,000–$800,000. He further testified that Texan Ford was still liable for the cost
of the vehicles and that the cost to the dealership was approximately $500,000. 
          Mike Capel, the General Sales Manager at Texan Ford in 2001, testified that
each of the sales deals had discrepancies, including problems with the driver’s
licenses and the insurance card copies. Several copies of the driver’s licenses had
fingerprints over the faces; and several of the sales deals had the same face on the
driver’s licenses. Officer Smith testified that multiple sales deals had driver’s
licenses with the same audit number. The same insurance cards were also used in
several deals. In a few of the sales deals, the VINs on the copies of the insurance
cards were not legitimate VINs. Oshman testified that, until Ingels and Smith
requested the sales documents, no one had noticed the problems. He also testified
that the salesman was responsible for obtaining the documents for the sales. 
          Appellant testified that the purchasers signed the paperwork at the time he
delivered the vehicles to them and that he never saw the purchasers again. He stated
that a check of each purchaser’s credit was run before the paperwork was completed
or the vehicle was delivered. Appellant also testified that he received the information
necessary to run credit checks by fax. However, no faxed documents were found in
any of the sales files. 
          William Ammons testified that he and Edward Waddell were involved in
dealing with stolen and forged checks. Waddell told Ammons that he could help him
obtain a vehicle. Waddell arranged for Ammons to meet him at a mall parking lot. 
Waddell and appellant drove up in a 2000 Lincoln Navigator. Appellant gave
Ammons the keys, but never asked him to sign any paperwork or to produce a
driver’s license or insurance. There was no trade-in, and Ammons made no down
payment. Waddell gave Ammons a payment book for the vehicle in the name of
Edward Bedell, but with Chrichlow’s home address. Ammons made three cash
payments directly to Chase Bank, the issuer of the payment book.


 
          John Hinz, a special agent with the Secret Service, testified that he investigated
and arrested Demeris Davis for counterfeit securities, specifically checks. Hinz
testified that Waddell worked with Davis with regard to counterfeit checks. When
Hinz arrested Davis, he too was in possession of one of the 19 vehicles sold by
appellant. 
          Appellant testified that he had met Chrichlow and a man named Henry Harris
in the dealership and sold them vehicles, and that subsequently Harris had referred
a lot of customers to him. Appellant stated that he met each customer off-site, with
the approval of sales managers, and that each showed him identification, a copy of
his driver’s license, and his insurance. Oshman testified, in rebuttal to appellant’s
testimony, that he found sales documents and some partially doctored driver’s
licenses and insurance cards in appellant’s desk after appellant was discharged from
Texan Ford. 
          Appellant was indicted for engaging in organized crime in violation of section
71.02 of the Texas Penal Code. The indictment alleged that appellant
with intent to establish, maintain and participate in a combination and
in the profits of a combination, said combination consisting of SHAWN
LEDET, EDWARD WADDELL, TAMARA CHRICHLOW, AND
DEMERIS DAVIS, [DID] COMMIT AND CONSPIRE TO COMMIT
the offense of THEFT, namely in that he did unlawfully pursuant to one
scheme and continuing course of conduct, appropriate, by acquiring and
otherwise exercising control over property, namely, EIGHTEEN
AUTOMOBILES, owned by HART OSHMAN, . . . with the intent to
deprive [HART OSHMAN] of the property and the total value of the
property appropriated was over two hundred thousand dollars.

The jury found appellant guilty, and assessed punishment at 10 years’ confinement,
suspended for 10 years, and assessed a $5,895.47 fine appellant. The trial court
ordered appellant to spend 180 days in county jail and to pay $400,000 in restitution
to Texan Ford as conditions of his community supervision.
Discussion
          Organized Criminal Activity
          In his first issue, appellant argues that the evidence was legally insufficient to
prove (1) that an illegal “combination” under Penal Code section 71.02 existed and
(2) that he committed the predicate offense of theft, as required to prove the offense
of engaging in organized criminal activity. See Tex. Pen. Code Ann. § 71.02
(Vernon Supp. 2004–2005).
Standard of Review
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational fact finder could
have found the essential elements of the crime beyond a reasonable doubt. Wesbrook
v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000); King v. State, 29 S.W.3d 556,
562 (Tex. Crim. App. 2000). Although our analysis considers all evidence presented
at trial, we may not re-weigh the evidence and substitute our judgment for that of the
fact finder. King, 29 S.W.3d at 562. 
 
Combination
          A person engages in organized criminal activity “if, with the intent to establish,
maintain, or participate in a combination or in the profits of a combination, . . . he
commits or conspires to commit” one of several enumerated offenses, including theft. 
Tex. Pen. Code Ann. § 71.02(a)(1) (Vernon Supp. 2004–2005). The State has the
burden of proving the combination. Hart v. State, 89 S.W.3d 61, 63 (Tex. Crim. App.
2002). A “combination” requires three or more people who collaborate in carrying
on criminal activities. Tex. Pen. Code Ann. § 71.01(a) (Vernon 2003). The State
must prove that the defendant intended to establish, maintain, participate in, or
participate in the profits of a combination and that the members of the combination
intended to work together in a continuing course of criminal activity. Hart, 89
S.W.3d at 63; Dowdle v. State, 11 S.W.3d 233, 236 (Tex. Crim. App. 2000). 
Participants in the combination need not know each other’s identity, and membership
in the combination may change. Tex. Pen. Code Ann. § 71.01(a)(1)–(2). However,
there must be evidence of an agreement to act together in this continuing course of
activity. Barber v. State, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988). Direct
evidence of intent is not required; circumstantial evidence may be used. See Hart, 89
S.W.3d at 64.
A jury may infer intent from any facts which tend to prove its existence,
including the acts, words, and conduct of the accused, and the method
of committing the crime and from the nature of wounds inflicted on the
victims. A jury may also infer knowledge from such evidence.

Manrique v. State, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).


 
          Viewed in the light most favorable to the jury’s verdict, the evidence shows
that appellant sold 19 vehicles under unusual circumstances, including the vehicles
driven by Chrichlow and Davis when they were arrested. Appellant sold each of the
vehicles for the manufacturer’s suggested retail price and with an extended warranty. 
The identities used to purchase the 19 vehicles had high credit scores and out-of-town
addresses. None of the purchasers of the 19 vehicles came into the dealership. Each
of the sales deals had discrepancies in the sales paperwork, specifically in the
insurance cards and the driver’s licences photographs and audit numbers. Although
appellant stated that each of the 19 buyers faxed their information to him so he could
run a credit check, no such faxes were found; however, doctored documents, such as
those used to obtain the vehicles from Texan Ford, were found in appellant’s desk
after he was terminated. None of the persons identified as purchasers took possession
of the vehicles; rather, each sale was obtained by identity theft. Appellant’s profits
and Texan Ford’s gross profits shot up dramatically from the sales of the 19 vehicles. 
          The evidence shows that Chrichlow visited appellant at the dealership several
times a week and was arrested while in possession of one of the 19 vehicles. The
search subsequent to her arrest led to the discovery of mail relating to three of the 19
vehicles sold by appellant. Chrichlow’s address was used on several payment books
for the false deals, including the payment book found in Ammons’s vehicle. The
evidence further shows that Waddell arranged for Ammons to receive one of the 19
vehicles and that Waddell and appellant delivered a Lincoln Navigator to Ammons. 
Appellant did not have Ammons sign any paperwork; nor did he obtain any
identification information from Ammons. Finally, when Davis was arrested for
counterfeiting checks in a scheme with Waddell, Davis was in possession of one of
the 19 vehicles. 
          Viewed in the light most favorable to the verdict, the evidence was legally
sufficient for a rational juror to conclude that appellant intended to and did participate
in a combination that collaborated in carrying on criminal activities through the
appropriation of automobiles from Texan Ford. 
Theft
          To prove the offense of engaging in organized criminal activity as a party, the
State must also prove that the defendant had the mental state required for commission
of the underlying offense. Hart, 89 S.W.3d at 63. Here, the underlying offense
charged was theft. Theft is committed when a person “unlawfully appropriates
property with the intent to deprive the owner of the property.” Tex. Pen. Code Ann.
§ 31.03(a) (Vernon Supp. 2004–2005).
          The evidence shows that appellant actively participated in a combination to
appropriate over $500,000 worth of property from Texan Ford, namely 19 vehicles.


 
All vehicles were purchased through identity theft. Each of the sales documents,
which appellant was required to gather, had discrepancies, including the use of the
same photograph on multiple licenses, multiple licenses with the same audit numbers,
and several insurance cards with false VINs. Similarly doctored documents were
found in appellant’s desk after he was discharged. The named purchasers had
unusually high credit scores and out-of-town addresses. No down payments were
made, and no vehicle was used as a trade-in. Appellant delivered each of the vehicles
off-site. We conclude that, viewed in the light most favorable to the verdict, the
evidence was legally sufficient for a rational juror to conclude that appellant intended
to deprive Texan Ford of property as alleged in the indictment.
          We overrule appellant’s first issue.
 
          Conditions of Community Supervision
          The jury assessed appellant’s punishment at ten years’ confinement and
recommended that he be given community supervision for ten years. The jury also
imposed a $5,895.47 fine. The trial court ordered appellant to serve 180 days’
confinement in the Harris County Jail and to pay $400,000 in restitution to Texan
Ford, as conditions of his community supervision.
          In his second issue, appellant contends that the 180 days’ confinement the trial
judge imposed as a condition of his community supervision is a violation of his Sixth
Amendment right to trial by jury. Appellant argues that the recent United Supreme
Court decision in Blakely v. Washington prohibits trial judges from adding a time of
incarceration to a jury’s assessed punishment of probation. __ U.S.__, 124 S. Ct.
2531 (2004). In his third and fourth issues, appellant contends the $400,000
restitution order imposed by the trial judge is unconstitutional because (1) it violates
his Sixth Amendment right to trial by jury and (2) it violates his right to due process.
Specifically, in his third issue, appellant argues that Blakely prohibits trial judges
from adding a restitution order to a jury’s assessed punishment of probation. __
U.S.__, 124 S. Ct. 2531 (2004). In his fourth issue, appellant contends the restitution
order violates his right to due process because the trial court did not orally add the
restitution order at the sentencing hearing and there was no factual basis for the
amount of the restitution.
          Article 42.12 of the Code of Criminal Procedure governs the imposition and
terms of community supervision. Tex. Code Crim. Proc. Ann. art. 42.12 (Vernon
Supp. 2004–2005). 
“Community supervision” means the placement of a defendant by a
court under a continuum of programs and sanctions, with conditions
imposed by the court for a specified period during which . . . a sentence
of imprisonment or confinement, imprisonment and fine, or confinement
and fine, is probated and the imposition of sentence is suspended in
whole or in part.

Id. art. 42.12 § 2(2)(B). The judge must determine the conditions of community
supervision, and may alter or modify the conditions at any time. Id. art. 42.12 §
11(a). “The judge may impose any reasonable condition that is designed to protect
or restore the community, protect or restore the victim, or punish, rehabilitate, or
reform the defendant.” Id. The conditions of community supervision may include
a number of requirements, including submitting a defendant in a felony case to a term
of confinement for no longer than 180 days in county jail. Id. art. 42.12 § 12(a). If
a defendant is placed on community supervision, the payment of restitution is also a
condition of the community supervision. Tex. Code Crim. Proc. Ann. art. 42.037(h)
(Vernon Supp. 2004–2005).



          Generally, a defendant must make a timely and specific objection at trial to
preserve his complaint on appeal. Tex. R. App. P. 33.1(a). A defendant’s failure to
object to the conditions of community supervision at trial affirmatively accepts the
terms. Speth v. State, 6 S.W.3d 530, 534–35 (Tex. Crim. App. 1999). Appellant did
not object to the conditions of community supervision at the punishment hearing; nor
did he file a motion for new trial. Appellant first complained of the conditions of
community supervision on direct appeal. Furthermore, appellant signed a copy of
the conditions of community supervision stating that he understood the terms and the
consequences for failing to comply. The document specifically included a provision
confining him to the Harris County Jail for 180 days. The condition of supervision
document signed by appellant also included the $400,000 restitution order.
          We hold that appellant did not preserve his complaints for appellate review
regarding the 180 days’ confinement or the restitution order. See Tex. R. App. P.
33.1(a); Speth, 6 S.W.3d at 534–35. His second, third, and fourth issues were waived.
          We overrule appellant’s second, third, and fourth issues.
 
 
CONCLUSION
          We affirm the judgment of the trial court.
 
                                                                                                                 
                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Hanks.
Publish. Tex. R. App. P. 47.2(b).