

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00109-CR

SUZANNE EDITHA JOHNSTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 17971

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

After independently verifying information received from Adam Higginbotham and thus establishing that Higginbotham was a reliable confidential informant regarding drug traffic in Upshur County, Casey Driggers, a former investigator with the Gilmer Police Department, decided to use Higginbotham in a controlled buy designed to target Shaun Weeks, a known drug dealer. Driggers fitted Higginbotham with a "covert [video] camera" and sent him onto the Weeks property to make the drug purchase. According to Driggers, the brick residence where the controlled buy took place belonged to Shaun's father, Hardy Weeks, who lived with Suzanne Editha Johnston, his "on again, off again" girlfriend.[1] This controlled buy led to Johnston's conviction by an Upshur County jury for organized criminal activity, her sentence of seventy years' imprisonment,[2] her fine of $10,000.00, and this appeal.

On appeal, Johnston argues that the jury's verdict is not supported by legally sufficient evidence, that the trial court erred in admitting extraneous-offense evidence, and that her sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. Because (1) legally sufficient evidence supported the jury's verdict and (2) Johnston failed to preserve her other points of error for our review, we affirm the trial court's judgment.

---

[1] Higginbotham testified that Johnston's daughter also lived with Hardy "[f]rom time to time."

[2] After being found guilty, Johnston pled true to the State's punishment enhancement allegation and was issued her sentence and fine.

*(1)     Legally Sufficient Evidence Supported the Jury's Verdict*

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

A person commits the offense of organized criminal activity "if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit . . . delivery . . . of a controlled

substance." TEX. PENAL CODE ANN. § 71.02(a)(5) (Supp.). The State's indictment alleged that Johnston

> did . . . knowingly deliver, by actual transfer, to CI-0049, a controlled substance listed in Penalty Group One of the Texas Controlled Substances Act, namely, methamphetamine, in an amount of one gram or more but less than four grams, by aggregate weight, including any adulterants and dilutants;
>
> And it is further presented in and to said Court that the defendant did . . ., with the intent to establish, maintain or participate in a combination or in the profits of a combination, the combination consisting of the defendant and SHAUN DALE WEEKS and HARDY HENRY WEEKS, who collaborated in carrying on criminal activity, intentionally and knowingly commit the offense of Delivery of a Controlled Substances Listed in Penalty Group One >1G <4G.

Under the hypothetically correct jury charge, the State was required to prove that (1) Johnston (2) intended to establish, maintain, or participate in either (a) a combination with the Weekses or (b) the profits[3] of a combination with the Weekses, and (3) committed or conspired to commit (4) delivery of a controlled substance.

Higginbotham testified that he called Shaun's cell phone to set up the drug deal and that Shaun agreed to sell him methamphetamine. Driggers explained that he had been inside of Shaun's residence, which was on a piece of property containing at least two residences and several recreational vehicles. Higginbotham said he went to Hardy's residence looking for Shaun because "Shaun said he would be there."

Higginbotham testified that he knew Shaun and Johnston and had smoked methamphetamine with Shaun, Johnston, and Hardy. As Higginbotham entered the Hardy

---

[3]"Profits" consist of any "property constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in Section 71.02," such as delivery of a controlled substance. TEX. PENAL CODE ANN. § 71.01(c).

4

residence, the video camera showed Johnston smoking methamphetamine at a desk in the living room. It also showed that Shaun arrived at Hardy's residence later with a bag of methamphetamine and asked Johnston for scales. On video, Johnston pulled out a digital scale from the desk, and Shaun used it to weigh the drugs. When Higginbotham informed Shaun that he would buy more methamphetamine later that day for someone else, Shaun claimed he had none, but Johnston told Higginbotham she would sell him the drugs. In Shaun's and Johnston's presence, Hardy told Higginbotham, "[W]e were just trying to call you." According to Higginbotham, even though the transaction was arranged through Shaun, Hardy had called Higginbotham to see if he wanted to purchase drugs that he and Johnston were also selling. After the buy, Driggers recovered from Higginbotham the video recording of the controlled buy together with 3.27 grams of methamphetamine, although, before sending him onto the property, Driggers had searched him and found no drugs. Driggers testified that he was familiar with Johnston based on narcotics investigations conducted by other law enforcement agencies and, as a result of information he learned, believed she was also a distributor of methamphetamine. Driggers testified that Shaun, Hardy, and Johnston had all conspired to sell methamphetamine.

During cross-examination, Driggers admitted he did not know whether Shaun shared in the profits of the controlled buy with Hardy or Johnston. He testified that, other than the transaction caught on video, he had no evidence that Johnston participated in or shared in the profits of other drug sales with the Weekses. Driggers also engaged in the following discussion:

> Q      All right. Now, if -- if everybody was in that together, he could have c[o]me in and bought directly from [Johnston] from the get-go, correct?

> A      Yes, sir.

5

Q       And, obviously, do you think it's safe to say Shaun didn't know whether [Johnston] had more drugs to sell?

A       I don't know that for sure.

Q       Okay.  Now, Shaun indicated he was out?

A       Yes.

Q       Now, when he was speaking for him being out, was he just speaking about himself individually?

A       Yes.

Q       All right.  So he -- safe to say, he didn't know what [Johnston] had?

A       No, sir.

Q       And had they been in business together, they might have had common knowledge of -- you know, a common possession of drugs.  Like if they had drugs to sell, they -- and they're all in this together, and they're all conspiring, they would probably all know what drugs they had, correct?

A       Yes, sir.

Q       And, obviously, Shaun didn't know what [Johnston] had, correct?

A       Yes, sir.

. . . .

Q       Okay.  Is it possible, in your mind, from seeing what you saw, that [Johnston] and Shaun weren't in this together?

A       Possibly, yes.

During his cross-examination, Higginbotham also testified that he did not know whether

Shaun sold drugs with Johnston but said, "I just know that it takes place in the same house . . . .

But I don't know if they did it together; I don't know if they did it separately."  However,

6

Higginbotham said he was not surprised to see Hardy and Johnston after his telephonic agreement with Shaun to purchase drugs and testified that he had seen Johnston sell methamphetamine from Hardy's residence at other times. Higginbotham also testified he knew he could acquire drugs from Hardy and Johnston. According to Higginbotham, Johnston traveled to acquire the methamphetamine she sold.

Johnston argues that the evidence is legally insufficient to establish the predicate offense because she never touched the money or the methamphetamine sold to Higginbotham. Due to cross-examination showing that it was possible Shaun, Hardy, and Johnston were working independently, Johnston also argues that the evidence is insufficient to show Johnston intended to establish, maintain, or participate in a combination that collaborated in a continuing course of criminal activities.

The predicate offense in this case was delivery of a controlled substance. Delivery, as contemplated by Section 71.02 of the Texas Penal Code requires more than simply "possessing a controlled substance even if the act is accompanied by an intent to later deliver that substance; it requires an act of transfer—either actual or constructive—to constitute 'delivery.'" *Hughitt v. State*, No. PD-0275-18, 2019 WL 4656010, at *5 (Tex. Crim. App. Sept. 25, 2019); *see Estrada v. State*, 570 S.W.3d 402, 410 (Tex. App.—Amarillo 2019, pet. filed).

"The offense of engaging in organized criminal activity requires that 'the actor must not only agree to participate but must himself perform some overt act in pursuance of the agreement.'" *Yates v. State*, 505 S.W.3d 631, 645 (Tex. App.—Texarkana 2016, pet. denied) (quoting *Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988); *Pardue v. State*, 252 S.W.3d 690, 700 (Tex.

7

App.—Texarkana 2008, no pet.)). "The overt act, though, 'need not be criminal in itself,' and 'acts that suffice for party liability—those that encourage, solicit, direct, aid, or attempt to aid the commission of the underlying offense—would also satisfy the overt act element of section 71.02.'" *Id.* (quoting *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003)); *see McIntosh v. State*, 52 S.W.3d 196, 201 (Tex. Crim. App. 2001) (finding that party liability can support a conviction for engaging in organized criminal activity).

Here, the jury was instructed on the law of the parties with respect to the predicate offense. Although Johnston did not deliver the methamphetamine to Higginbotham, she was present during the time of the offense, welcomed Higginbotham by inviting him to smoke methamphetamine, and provided Shaun with the scales used to weigh the drugs sold to Higginbotham. From this evidence, the jury could rationally find that Higginbotham encouraged or aided Shaun's delivery of methamphetamine. Therefore, we find the evidence legally sufficient to support the finding that Johnston committed the predicate offense as a party.

Next, due to a lack of evidence to show profit-sharing, the State had to prove Johnston intended to establish, maintain, or participate in a combination with Shaun and Hardy and that the predicate offense was committed as a result of the combination. "Intent and knowledge are fact questions for the jury and (absent a confession) are almost always proven by circumstantial evidence." *Yates*, 505 S.W.3d at 644 (citing *Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984)). "A jury may infer intent from any facts that tend to prove the combinations existence, including the defendant's words, acts, and conduct, and the method of committing the enumerated offense." *Id.* (quoting *Arredondo v. State*, 270 S.W.3d 676, 682 (Tex. App.—Eastland 2008, no

8

pet.) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Myers, J., concurring))).

"[A] combination means three or more persons who collaborate in criminal activities, even though . . . the participants may stand in a wholesale-retailer or other arms-length relationship in illicit distribution operations." *Id*. (citing TEX. PENAL CODE ANN. § 71.01(a)). "[T]he phrase 'collaborate in carrying on criminal activities' cannot be understood to include an agreement to jointly commit a single crime; the State must prove more than that the appellant committed or conspired to commit one of the enumerated offenses with two or more other people." *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999). "[T]he State must show that the predicate offense was committed as part of a collaboration of three or more people working together in a continuing course of criminal activities." *O'Brien v. State*, 544 S.W.3d 376, 391 (Tex. Crim. App. 2018); *see Dowdle v. State*, 11 S.W.3d 233, 236 (Tex. Crim. App. 2000). "It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal." *Yates*, 505 S.W.3d at 645 (quoting *Arredondo*, 270 S.W.3d at 682). But "[p]roof of a single ad hoc effort . . . is insufficient." *Id*. (quoting *Arredondo*, 270 S.W.3d at 682).

The relationship among Johnston, Hardy, and Shaun was not just a collaboration for criminal purposes. Johnston was Hardy's live-in girlfriend, and Hardy's home was on property that also contained his son's home. We believe that, when viewed in a light most favorable to the verdict, the jury could have rationally found that Johnston, Shaun, and Hardy's operations were like a family business formed for the illicit purpose of distributing methamphetamine.

9

The evidence showed that Johnston traveled to acquire methamphetamine, Johnston and Shaun both distributed methamphetamine, and Johnston, Shaun, and Hardy all used methamphetamine. Although Johnston argues that Hardy was not a party to the combination, Higginbotham testified that he could acquire drugs from Hardy, Johnston, and Shaun and said their drug deals "t[ook] place in the same house" that belonged to Hardy. This was demonstrated on the day of the controlled buy. Shaun agreed to sell the drugs but met Higginbotham at Hardy's house, where Johnston was smoking methamphetamine. While there, Hardy said he had been trying to reach Higginbotham, a statement Higginbotham indicated meant Hardy and Johnston wished to sell him more drugs. Johnston encouraged or aided Shaun's delivery of methamphetamine to Higginbotham by providing digital scales to facilitate the transaction. When Shaun informed Higginbotham that he had no more drugs for sale, Johnston agreed to provide more methamphetamine. Although Johnston argues that this shows she did not work with Shaun because she had a separate "stash" of drugs, this testimony showed that Johnston and Shaun collaborated by sharing customers.

Hardy provided the property where the combination's customers would all meet to purchase drugs. The evidence showed Johnston sold drugs in Hardy's home in the past, assisted Shaun in weighing the drugs sold during the controlled buy, and agreed to supply Shaun's customer with drugs in the future. Rather than showing only that Johnston, Shaun, and Hardy jointly committed a single crime or engaged in a single criminal episode, the evidence showed that Johnston, Shaun, and Hardy worked together to distribute methamphetamine in a continuing

10

course of criminal activities. The evidence at trial was legally sufficient to show that Johnston engaged in organized criminal activity.

*(2)*    *Johnston Failed to Preserve Her Other Points of Error for Our Review*

To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2).

*a.*    *Johnston Did Not Preserve Her Complaint about Extraneous Offenses*

Johnston argues that the trial court erred in admitting extraneous-offense evidence showing she sold drugs on other occasions and was responsible for a pre-trial attack on Higginbotham. We find both arguments unpreserved.

"To preserve error, it has been consistently held that one must object each and every time [allegedly] inadmissible evidence is offered." *Smith v. State*, 494 S.W.3d 243, 255 (Tex. App.—Texarkana 2015, no pet.) (quoting *Long v. State*, 10 S.W.3d 389, 399 (Tex. App.—Texarkana 2000, pet. ref'd) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991))). The record demonstrates that this rule was not followed with respect to evidence showing Johnston sold drugs on other occasions.

Driggers said he was familiar with Johnston before the controlled buy based on narcotics investigations conducted by other law enforcement agencies. Without objection, Driggers testified that the information he learned from other agencies formed his belief that Johnston was a

11

distributor of methamphetamine. Higginbotham also testified, without objection, that he knew Johnston sold methamphetamine on dates other than the date of the controlled buy. Because Johnston failed to timely and regularly object to evidence of her extraneous drug transactions, we find her complaint unpreserved. Moreover, "[a]n error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)); *see Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). During cross-examination, Johnston elicited testimony from Higginbotham that he knew he could purchase methamphetamine from her and Hardy before the date of the controlled buy.

Johnston also argues that the trial court erred in allowing Higginbotham to testify that he "was almost beaten to death by 6 to 9 guys" after Johnston recorded on her cell phone the video of the controlled buy and distributed it to the public. The State argues that Johnston did not preserve this issue. We agree.

The record shows that, during argument resulting from an untimely objection to Driggers' testimony of extraneous drug transactions, the State also said, "This informant—and we're about to get into that in just a minute—almost died being beat half to death." The record does not show that Johnston lodged a specific objection to this evidence. To the extent her trial objection regarding extraneous drug transactions can be imputed to the beating, Johnston only complained that she was not given reasonable notice of the State's intent to use the evidence. A "point of error on appeal must comport with the objection made at trial." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Johnston does not complain of the lack of timely notice on appeal.

12

Instead, she argues that the trial court erred in admitting the extraneous-offense evidence because it constituted improper character evidence, was irrelevant, or, alternatively, any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Because our record shows that the trial court did not consider the issues Johnston now raises on appeal with respect to Higginbotham's beating, we overrule this complaint.

b. *Johnston Did Not Preserve Her Eighth Amendment Complaint*

Johnston also argues that her sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment because it is excessive and grossly disproportionate to her crime. The State argues that Johnston failed to preserve this complaint at trial. We agree.

"To preserve for appellate review a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired." *Navarro v. State*, No. 06-19-00006-CR, 2019 WL 4280615, at *1 (Tex. App.—Texarkana Sept. 11, 2019, no pet. h.) (quoting *Russell v. State*, 341 S.W.3d 526, 527 (Tex. App.—Fort Worth 2011, no pet.)); *see* TEX. R. APP. P. 33.1; *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999); *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995); *Duren v. State*, 87 S.W.3d 719, 732 (Tex. App.—Texarkana 2002, pet. struck).

Our review of the appellate record shows that Johnston did not raise any complaint about her punishment with the trial court. Because Johnston's Eighth Amendment complaint was not preserved, we may not address it on the merits. *See Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010) (op. on reh'g) (per curiam). We overrule this point of error.

13

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:      November 1, 2019
Date Decided:        November 7, 2019

Do Not Publish