**AFFIRMED as MODIFIED and Opinion Filed September 22, 2022**



**In The**
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-20-00304-CR

**DESMOND ARMOND JONES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1900479-W**

## MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Goldstein
Opinion by Justice Goldstein

Appellant Desmond Armond Jones was convicted of engaging in organized criminal activity and sentenced to confinement in prison for ninety-nine years. *See* TEX. PENAL CODE ANN. §§ 71.02(a)(1), (b)(3).[1] In seven issues, appellant contends that the evidence was insufficient to support his conviction and the jury's rejection of his affirmative defense of duress; the trial court erred in denying his motions to quash the indictment and to suppress evidence; and the trial court erred in overruling his objection to certain testimony. In one cross-issue, the State asks us to modify the

---

[1] We refer to Section 71.02 of the Penal Code as the "engaging statute" for judicial economy.

judgment to reflect that the jury, not the trial court, assessed punishment. We modify the judgment and affirm as modified.

## BACKGROUND

On the morning of June 28, 2017, thirteen-year-old S.R. was abducted from her Lancaster, Texas home. Two days later, her body was recovered in an abandoned house in Dallas, Texas, alongside the body of Michael Titus, a reputed drug dealer. Officers were led to the bodies by appellant, who considered Titus a close friend. Interviews with appellant and further investigation revealed that S.R. and Titus had been killed in connection with a drug robbery.

Titus served as the "muscle" for a group of drug dealers the State refers to as the Fields crew.[2] The group's namesake, "King" Darius Fields, ran the interstate drug trafficking operation. Other members of his crew were Devontae Owens (Fields's partner), Laquon "Chuck" Wilkerson (additional "muscle" for the crew), and LaPorshya Polley (Fields's girlfriend).

The week before the kidnapping, the Fields crew imported over a hundred pounds of marijuana valued at over $200,000 from out of state. The crew moved the stash to and from different motels to avoid detection.[3] On Monday, June 26, 2017, the stash was being kept at a Motel 6 in Lancaster, Texas, with Titus and Polley

---

[2] We reference "Fields crew" or "crew" to mean the same combination of identified individuals that engaged in the organized criminal activities identified herein.

[3] Federal Bureau of Investigation (FBI) Special Agent Jennifer Mullican testified that in a later interview, Polley explained that "the smell of the marijuana was overpowering and [the crew] didn't want anybody to report them."

charged with watching over it. In the morning or early afternoon of June 26, Titus spoke with appellant on the phone and told him about the stash. Appellant, a drug dealer himself, wanted to see the stash, so Titus gave him the location. Appellant arrived at the motel in his girlfriend's white Ford 500, which had body damage on the passenger side. While there, appellant took a photograph of himself posing with a large amount of cash and posted it on Facebook. In his recorded interviews, appellant said he wanted to be "plugged in" to the Fields crew because he was broke and Fields's "dope do numbers" (i.e., it was highly marketable). He said that Titus declined, saying that the crew did not know him. Nevertheless, Titus offered appellant a "chunk" of marijuana to sell. Appellant left the motel in the afternoon.

Later that evening, Titus left the motel room, leaving Polley to watch the stash. At around 6:10 p.m., surveillance cameras at the motel captured four men in two cars driving into the motel parking lot. They parked the cars and gained entry into the room where the stash was being held. Surveillance footage shows Polley exiting the room and running along the outside of the building to the front office. The footage then shows one of the men carrying plastic bags out of the room and loading them into the trunk of one of their cars. The men then drove away. Cell phone records reflect that Polley called Fields, and surveillance footage shows Fields arriving at the motel within ten minutes. The footage shows the two speaking, Fields becoming visibly upset, and the two driving away in Fields's car.

Later investigations revealed that the Fields crew knew one of the robbers as Kendall Perkins, a drug dealer with a reputation for stealing from other drug dealers. Over the next few hours, cell phone records show a flurry of calls within the Fields crew and several calls to Perkins. When the Fields crew was unable to secure return of the drugs, around 9:30 p.m., Polley called 911 and reported a robbery. Officer Tracy Hightower of the Lancaster Police Department was dispatched to the motel. Officer Hightower retrieved surveillance footage and interviewed Polley, who said that the robbers took her purse, her cell phone, and two firearms. Polley did not mention the marijuana.[4]

The next day, June 27, in the early afternoon, the Fields crew met at an arcade on Village Fair Drive in Dallas, Texas, to discuss retrieving the drugs. Special Agent Mullican testified that she retrieved surveillance footage from the arcade, which showed cars belonging to Fields and Owens in the parking lot. Also present was the white Ford 500 belonging to appellant's girlfriend. In his interviews, appellant told officers that the crew discussed kidnapping Perkins's girlfriend, LeDoris Randle, and holding her for ransom until Perkins returned the drugs. Appellant said that on the evening of June 27, he, Titus, Owens, and Wilkerson drove to and surveilled Randle's work but did not encounter her there. He said they also went to Randle's mother's residence, but she was not there either.

---

[4] The State argued that Polley called the police as a precautionary measure—the Fields crew wanted to avoid being linked to Perkins if he later used the firearms in the commission of a crime.

At around 9:30 a.m. on June 28, appellant, Titus, Owens, and Wilkerson went to another residence they believed to be Randle's. The residence belonged to Randle's cousin, Rosenina Randle. Rosenina was at work, but her then-sixteen-year-old daughter, L.R., was there, along with S.R. (LeDoris Randle's daughter), who was living with them at the time. Appellant said that he and Owens stood watch outside, while Wilkerson and Titus entered the residence. He said that Wilkerson and Titus reported back that Randle was missing, and Owens told them to take S.R. instead. Wilkerson and Titus then came out of the house with S.R., who was in her pajamas and had a pillowcase over her head. The men then drove with S.R. to a restaurant owned by Owens's family. On the way, one of the men called LeDoris Randle, said they had S.R., threatened to kill her if the drugs were not returned, and demanded that she not call the police. LeDoris called Rosenina to inform her that S.R. may have been taken and asked her to go home and check. Rosenina went home and discovered S.R. missing, at which point she called 911.

Officers arrived on the scene and began a missing-person investigation. They interviewed neighbors, one of whom had seen a white Ford sedan with damage on the passenger side that morning. The Lancaster Police Department, working with the FBI, initiated an Amber alert and informed local media about the kidnapping. Among the information given to the public was a description of the white Ford sedan. Appellant's girlfriend became aware that her car was being shown on the news and called the police to inform them that she had loaned it to appellant. Members of the

–5–

public also provided tips that led to appellant and members of the Fields crew becoming persons of interest in the kidnapping.

A team of officers was assigned to track down appellant. The team included FBI Special Agent Michael Mahan, Dallas County Deputy Sheriff Krystal Offray, and an officer from the Lancaster Police Department. Late in the evening on June 30, the team was able to locate appellant at his godmother's house. They interviewed him for about an hour, at which point appellant offered to take officers to "the bodies." Appellant led the officers to a "dope house"[5] on Kiest Boulevard in Dallas, Texas. The team discovered the bodies of Titus and S.R., which had begun decomposing in the summer heat.

Over the next week, appellant gave six interviews to officers, five of which were introduced at trial. Appellant was *Mirandized* for each interview that was introduced in evidence. In the first interview on July 1, 2017, appellant denied involvement in the kidnapping and murders. When officers asked what happened earlier in the week, appellant responded, "We got robbed" and "All I know is we got robbed." He said he was selling drugs on the morning of June 28 and was not with the Fields crew. He said that Titus had gone to the dope house to "lay low" while the crew retrieved the drugs. Appellant was placed under arrest for failure to report a felony.

---

[5] A "dope house," also referred to as a "trap house" in the record, is an abandoned house used to sell drugs.

On July 3, while appellant was in jail, he asked to speak to officers again. Appellant continued denying involvement in the kidnapping and murders. He said that Titus told him that the Fields crew suspected Titus of being involved in the robbery. When officers asked if appellant became involved in the subsequent kidnapping in order to help out his friend, appellant denied involvement, stating he cannot be peer pressured and that he would have helped Titus financially but would not kidnap a little girl. Later, officers asked appellant to recount the conversation with Titus "word for word." He said that Titus told him he had "hurt a little girl" and kept saying "I love you." Appellant said he had never seen Titus so scared and that Titus was afraid of "going away for a long time." Appellant said he told Titus to "lie on the stand" and say "[y]ou were forced." Later in the interview, officers asked appellant if he knew who killed Titus. He replied, "I know who killed . . ." and paused. He then asked to go to the bathroom and said "I got caught. Damn."

In his final interview on July 7, appellant admitted he was present for the planning meeting on June 27 and the kidnapping on June 28. Appellant claimed that the Fields crew suspected him of being involved in the robbery and threatened to kill him if he did not help them recover the drugs. He admitted that he was standing with Owens at Owens's car when Titus and Wilkerson went into Randle's house and retrieved S.R. He said he went to the restaurant after the kidnapping, but left to return his girlfriend's car. Owens picked him up from his girlfriend's house and they went to the dope house to meet Wilkerson and Titus, who had killed S.R. and were

cleaning her body with bleach. Appellant said that was when Wilkerson shot Titus

Appellant said that Wilkerson left the gun behind, which Owens later explained was meant to mislead the police into believing that Titus had committed suicide.

After his last interview, appellant was arrested for aggravated kidnapping. The State ultimately charged appellant with engaging in organized criminal activity, alleging aggravated kidnapping and murder as the predicate crimes. During pre-trial, appellant filed a motion to suppress his statements to the police. The trial court held a hearing on the motion and took it under advisement. Appellant also filed a motion to quash the indictment. On the first day of trial, the trial court denied both motions. At trial, the State offered appellant's recorded interviews, along with transcriptions of the interviews, into evidence. Appellant's counsel responded "no objection" and they were admitted. In its direct examination of the interviewing officers, the State played portions of the recordings and read from the transcripts without objection from appellant.

The jury found appellant guilty of engaging in organized criminal activity and assessed punishment at ninety-nine years' confinement. The trial court entered judgment accordingly. This appeal followed.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE SUPPORTING ELEMENTS OF ENGAGING IN ORGANIZED CRIMINAL ACTIVITY

In his first and second issues, appellant contends that the evidence was factually and legally insufficient to support his conviction. The State responds that

factual sufficiency is no longer recognized in Texas and the evidence was sufficient to support each element of the charged offense under the correct standard.

## A. Standard of Review

The State is correct that Texas no longer recognizes factual sufficiency as a grounds for challenging a criminal conviction. In 2010, the court of criminal appeals concluded that the factual-sufficiency standard had become "indistinguishable from the *Jackson v. Virginia* legal-sufficiency standard." *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Because there was no longer any meaningful difference between the two, the *Brooks* court abolished the factual-sufficiency standard. *See id.* at 911; *see also Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (explaining that *Brooks* "abolished the factual-sufficiency review as it applies to criminal convictions"). Texas now recognizes "only one standard" in evaluating whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt: the *Jackson v. Virginia* legal-sufficiency standard. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).

Under the *Jackson* legal-sufficiency standard, we consider whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). This standard requires the appellate court to defer "to the responsibility of the trier of fact to fairly resolve conflicts in the testimony,

to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Villa*, 514 S.W.3d at 232 (citing *Jackson*, 443 U.S. at 319). We may not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The court conducting a sufficiency review must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *Villa*, 514 S.W.3d at 232. Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016) (citing *Jackson*, 443 U.S. at 319). We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Brooks*, 323 S.W.3d at 899. This is because the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *See id.* Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

### B.    Applicable Law

The elements of engaging in organized criminal activity are: (1) a person (2a) with the intent to establish, maintain, or participate in a combination or in the

profits of a combination or (2b) as a member of a criminal street gang, (3a) commits, or (3b) conspires to commit, one or more of the predicate offenses enumerated in the statute. [6] *See* TEX. PENAL CODE ANN. § 71.02(a); *Zuniga v. State*, 551 S.W.3d 729, 735 (Tex. Crim. App. 2018). "Combination" means "three or more persons who collaborate in carrying on criminal activities, although: (1) participants may not know each other's identity; (2) membership in the combination may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations." TEX. PENAL CODE ANN. § 71.01(a).

The "combination" element requires more than the mere intent to commit a predicate offense, a plan to commit a single act, or proof of working jointly to commit a crime—it requires proof of continuity. *Hart v. State*, 89 S.W.3d 61, 63–64 (Tex. Crim. App. 2002); *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999). The activities do not have to each be criminal offenses to satisfy the statutory requirement, and a single criminal offense can be sufficient. *Nguyen*, 1 S.W.3d at 697; *see also, e.g.*, *Dowdle v. State*, 11 S.W.3d 233, 236 (Tex. Crim. App. 2000) (continuous activities after a shooting included fleeing, re-grouping, discussing a plan of action, and traveling to another country with stolen goods). However, the statute requires proof of intended continuity, i.e., that "the appellant intended to

---

[6] Appellant was originally charged under both alternative theories of the second and third elements. Prior to trial, the State moved to strike alternative theories 2(b) and 3(b) from the indictment. The trial court granted the motion, and the jury charge omitted the street gang and conspiracy elements.

'establish, maintain, or participate in' a group of three or more, in which the members intend to work together in a continuing course of criminal activities." *Nguyen*, 1 S.W.3d at 697.[7]

Included in the list of predicate offenses enumerated in the statute are the ones charged in this case: murder and aggravated kidnapping. *See* TEX. PENAL CODE ANN. § 71.02(a)(1). Murder includes (a) intentionally or knowingly causing the death of an individual or (b) and with the intent to cause serious bodily injury, committing an act clearly dangerous to human life that causes the death of an individual. *See id.* § 19.02. Aggravated kidnapping includes intentionally or knowingly abducting another person with the use or exhibition of a deadly weapon. *Id.* § 20.04(b). "Abduct" means "to restrain a person with the intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2).

### C.    Application of Law to Facts

Appellant advances two arguments under his legal-sufficiency challenge. First, he argues that he was not a part of the conspiracy, but rather was coerced to

---

[7] The offense of engaging in organized criminal activity does not preclude application of the law of parties. *Otto v. State*, 95 S.W.3d 282, 284 (Tex. Crim. App. 2003). Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both" and each party to an offense may be charged with commission. TEX. PENAL CODE ANN. § 7.01(a), (b). A person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

participate. Second, he argues that the evidence was insufficient to establish a "combination," because there was no evidence of "intended continuity."

### 1. *Intent to participate*

Appellant argues that he "was not a part of a criminal conspiracy, but was compelled to act by that conspiracy." He claims that "[a]ll of his actions were the result of being compelled to act the way he did under the ongoing threat of death." We construe these arguments as challenging the evidence in support of the second element of engaging in organized criminal activity: intent to establish, maintain, or participate in a combination or in the profits of a combination.[8]

The State contends that the combination was the Fields crew's drug trafficking operation and argues that appellant intended to participate in that combination. In his recorded statements to law enforcement, appellant admitted he was a drug dealer and he sold the same type of "kush" as the rest of the Fields crew and did so outside of the crew's house. Although the State was not required to prove that appellant knew the members of the crew,[9] the evidence showed that appellant was close

---

[8] Although appellant references the "criminal conspiracy," we take him to mean the combination. The third element of engaging in organized criminal activity requires proof that the defendant committed or conspired to commit a predicate offense. TEX. PENAL CODE ANN. § 71.02(a). As noted above, however, the trial court struck the conspiracy language from the indictment. Thus, appellant was tried for committing, not conspiring to commit, aggravated kidnapping and murder. *See Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988) ("A person may be guilty of criminal conspiracy by doing nothing more than agreeing to participate in the conspiracy, as long as another conspirator commits some overt act in furtherance of the conspiracy. But to commit the offense of engaging in organized criminal activity, the actor must not only agree to participate but must himself perform some overt act in pursuance of that agreement.").

[9] *See* TEX. PENAL CODE ANN. § 71.01(a)(1) (providing that a combination may exist even if the participants do not know each other's identity).

friends with Titus and knew or at least recognized other members of the crew. On the day of the robbery, appellant showed interest in selling the crew's drugs. When Titus took appellant to the motel on the day of the robbery, appellant was so impressed with the amount of drugs that he photographed himself in the room posing with a large amount of cash and posted the picture to social media. Appellant also asked Titus to "plug me in with your people." Although appellant claimed that Titus declined to make an introduction, he later admitted that Titus gave him some drugs to sell because appellant was broke and "his dope do numbers."

Appellant does not address this evidence, focusing instead on the defense that he was coerced into taking part in the kidnapping and murder. The State argues that the evidence shows appellant took part in the kidnapping voluntarily in order to create a closer connection with the Fields crew and his coercion argument is fabricated. The only evidence supporting appellant's mental state was appellant's own recorded statements to law enforcement, which the State urged the jury to find not credible. The State highlighted two key statements from appellant that undermined his claim of coercion. The first occurred when officers suggested appellant participated in the kidnapping to help out Titus, appellant's close friend, who had been accused of being involved with the robbery. Appellant quickly rebuffed the suggestion, saying: "My partners can't peer pressure me into none of that, bro like. You can't peer pressure me bro. You in a jam, I'll help you get some money, try and get some money . . . but kidnapping!? Come on. No, bruh. No. No.

That's something I will not do. I will not, come on, no. I'm not taking no little girl." As the State correctly pointed out, appellant would admit in later interviews that he served as a lookout for the kidnapping and was present when S.R. and Titus were killed. The second statement was in appellant's recounting of his conversation with Titus after Titus killed S.R.: "He knew he was going away for a long time. He knew he was going, I tried to talk to him: 'Like, bitch, lie on the stand bruh. You were forced, bruh. You were forced. You can't, you can't, can't blame yourself.'" The State argued that these statements show that appellant willingly participated and fabricated his coercion arguments just as he suggested Titus should do.

Appellant characterizes these conflicts as him gradually "open[ing] up" to officers as they gave him further assurances. To be sure, there was some evidence supporting that argument. Special Agent Mahan testified that, although appellant's story contained some lies and some truths, appellant gave more of the truth with each successive interview. Nevertheless, the jury was presented with conflicting accounts of the story from appellant himself. Thus, appellant's credibility was a key issue the jury had to determine when deciding whether to find him guilty. Because the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony and because resolution of conflicts or inferences therefrom lies within the exclusive province of the jury, it may choose to believe all, none, or some of the evidence presented to it. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995) (en banc).

–15–

We cannot usurp that role by substituting our opinion in its place. *Matlock v. State*, 392 S.W.3d 662, 668–70 (Tex. Crim. App. 2013); *see also Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988) ("Under the *Jackson* standard, the reviewing court is not to position itself as a thirteenth juror in assessing the evidence. Rather, it is to position itself as a final, due process safeguard ensuring only the rationality of the factfinder.").

We conclude that the evidence was legally sufficient for the jury to conclude beyond a reasonable doubt that appellant intended to establish, maintain, or participate in the Fields crew's combination or its profits.

### 2. *Intended Continuity*

In his second argument, appellant contends that the criminal acts in this case did not support the finding of a combination under the engaging statute. He argues that the kidnapping and murder did not constitute a continuing course of criminal activity, but were instead single *ad hoc* efforts. *See Nguyen*, 1. S.W.3d at 694 (citing TEX. PENAL CODE ANN. § 72.01(a) (phrase "carrying on criminal activities" in the definition of "combination" implies "continuity—something more than a single, *ad hoc* effort")). We reject appellant's argument.

First, the argument narrows the scope of the combination to the kidnapping and murder of S.R. But the evidence presented at trial was not limited to those crimes. The State presented evidence that the Fields crew was involved in an interstate drug-trafficking operation. Appellant told officers that the drugs he saw in

the hotel room were a recent shipment. The State established through cell phone records that Fields had traveled to Denver, Colorado and Los Angeles, California the week before the robbery. Special Agent Mullican testified that, following Fields's arrest, a forensic search of his cell phone revealed "numerous videos and pictures which appeared to depict drug trafficking." She continued: "There were pictures of marijuana. There was chat communication describing how much a certain brand of marijuana would cost." Furthermore, it is undisputed that the Fields crew's kidnapping of S.R. was not a one-off event. After the robbery, the crew concocted a plan to get the drugs back from Perkins and, by appellant's own admission, decided to kidnap S.R. to hold as ransom for the drugs.[10] Appellant's counsel even referred to the kidnapping as an "inventory control method" during cross-examination of Special Agent Mahan. When the State challenged that characterization as brash during closing argument, counsel responded that he used that phrase because "[t]hat's what is, because that's how they look at it. It's just a business."

On this record, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that the Fields crew, in a continuing course of criminal activity, acted as a combination of three or more persons that carried on the criminal activity of interstate drug trafficking, and the kidnapping and murder of S.R. were predicate

---

[10] Another motive, according to Special Agent Mullican was "to send a message." She testified: "In this kind of narcotics trafficking world, you can't appear to be a punk, I guess, for lack of better words. So if somebody steals from you, you have to prove to the community, prove to those that they can't do that to you. So I believe [S.R.] was kidnapped and killed so that Darius Fields and his group can show people not to mess with him again."

offenses that appellant committed with the intent to establish, maintain, or participate in that combination or its profits. *See* TEX. PENAL CODE ANN. §§ 71.01(a), 71.02(a).

Even if we accepted appellant's premise and ignored the Fields crew's drug trafficking business, the result would be the same. While it is true that the engaging statute is not satisfied by proof of "an agreement to jointly commit a single crime," there is also no "requirement that more than one criminal offense must be proved to establish the offense" of engaging in organized criminal activity. *See Nguyen*, 1 S.W.3d at 697–98. In *Dowdle*, for example, the defendant and two of his friends were convinced to participate in a burglary by Mills, a known thief, and the group carried out the burglary that same night. *See Dowdle v. State*, 11 S.W.3d 233, 234 (Tex. Crim. App. 2000). After the burglary, an off-duty officer happened to notice the group carrying the stolen items to their car on his way home from work. *See id.* When he approached the car, Mills shot him. On appeal from the defendant's conviction under the engaging statute, the court of criminal appeals concluded that the analysis of "continuing course of criminal activity" was not limited to the burglary and shooting:

> The Court of Appeals' analysis does not take into account the co-conspirators' activities following the shooting. The "continuing course of criminal activities" engaged in by appellant and the co-conspirators did not end with the shooting. The co-conspirators fled the scene, re-grouped to discuss what their plan of action would be, combined the separate loads of stolen property and traveled to another county to secrete the stolen property and the officer's gun.

*Id.* at 236. After summarizing the defendant's confession of these events, the Court concluded: "Clearly, appellant's participation in organized criminal activities was not over when the officer was shot." *Id.* at 237.

Appellant relies on *Ross v. State* and *Smith v. State* to argue lack of continuity in this case. In *Ross*, the defendants and victim were involved in a road rage altercation, with the defendants chasing the victim's car down, throwing several beer bottles at her car, and eventually catching up with and physically assaulting her. *See Ross v. State*, 9 S.W.3d 878, 880 (Tex. App.—Austin 2000, pet. ref'd). The court held that, despite the defendant and his cohorts committing multiple offenses ("a series of assaults [that] culminated in the beating"), the case before it "present[ed] a spontaneous, retaliatory series of actions that were all part of the same criminal episode." *Id.* at 882. Thus, the court concluded that the evidence was insufficient to establish the defendant's "intent to form a combination that would carry on a continuing course of criminal activities." *See id.* (citing *Nguyen*, 1 S.W.3d at 697). In *Smith*, the defendant was arrested after making three purchases of stolen cigarettes from an undercover federal agent. *See Smith v. State*, 36 S.W.3d 908, 909 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). In the third deal, the defendant arranged for a friend to handle payment for the cigarettes. *See id.* The court concluded that, although both the defendant and his friend independently told the undercover agent they would be willing to make more purchases, there was no evidence of their intent to "work together in a *continuing* course of criminal activities." *Id.* at 910 (emphasis

–19–

in original) ("Th[e] evidence shows that appellant was trading in stolen cigarettes, but does not show that appellant's transaction with [his friend] was anything more than a one-time deal.").

The facts of this case eclipse those of *Ross* and *Smith*, and surpass even *Dowdle*. We are not presented with "a one-time deal" or "a spontaneous, retaliatory series of actions that were all part of the same criminal episode." *See Ross*, 9 S.W.3d at 880; *Smith*, 36 S.W.3d at 909. After the robbery at the motel, the Fields crew sprang into action. According to appellant, Owens threatened both his and Titus's lives. When it became clear that Perkins was the perpetrator, the group met to discuss how to secure return of the drugs. They initially planned to kidnap Perkins's girlfriend, and appellant assisted in surveilling her place of work. They then drove to the girlfriend's mother's house and conducted surveillance there for several hours. When Perkins's girlfriend failed to show, the crew left. The next morning, while appellant served as a lookout, other crew members entered the house and brought out S.R., who was in her pajamas, with a pillow case over her head. They then travelled in separate cars to a restaurant owned by Owens's family, placing ransom calls to S.R.'s family. They threatened to kill her if they did not get their drugs back.

Appellant denied being present when both S.R. and Titus were killed but ultimately admitted he saw Titus get shot. In one of the versions of his story, appellant said that after the kidnapping, he and Owens went to return appellant's girlfriend's car and met back up with Titus and Wilkerson at the dope house, at

which point Titus told appellant he had shot S.R. Appellant said that Titus and Wilkerson wiped S.R.'s body and the rest of the house down with bleach, and that was when he saw Wilkerson shoot Titus. Appellant recalled that Wilkerson shot Titus with Titus's own gun, which Wilkerson had confiscated from Titus a week before (although in a different version of the story, Titus used that gun to kill S.R.). Appellant also said that Wilkerson left Titus's gun behind, which Owens later told him was intended to make Titus's death look like a suicide.

Appellant led officers to the dope house, and agents from the FBI and the Lancaster police department investigated the scene and other evidence. A forensic analysis of the house revealed no fingerprints or traces of DNA, but S.R.'s pajamas were recovered with bleach stains. Analysis of appellant's clothes revealed gunshot residue in the waistband of appellant's shorts. Analysis of Owens's car revealed a footprint outline in bleach of a similar size and outline to appellant's shoes.

Like *Dowdle* and unlike *Ross* and *Smith*, the ongoing criminal activity did not end with S.R.'s murder. *See Dowdle*, 11 S.W.3d at 234; *Cf. Ross*, 9 S.W.3d at 880; *Smith*, 36 S.W.3d at 909. The Fields crew committed a second murder and used bleach to destroy the evidence. What sets this case apart from even *Dowdle*, however, are the events leading up to the kidnapping. In *Dowdle*, the defendant was not involved in planning the burglary with Mills, and there was no evidence that the defendant wanted to join Mills in a burglary spree. *See Dowdle*, 11 S.W.3d at 234. Here, there was some evidence that appellant wanted to sell drugs for the crew and

assisted not only with the commission of the offenses and the cover up, but also with the planning.

We conclude that the evidence was legally sufficient for the jury to find beyond a reasonable doubt that the Fields crew constituted a combination of "three or more persons who collaborated in carrying on criminal activities." *See* TEX. PENAL CODE ANN. § 71.01(a).

We overrule appellant's first and second issues.

## II. SUFFICIENCY OF THE EVIDENCE SUPPORTING AFFIRMATIVE DEFENSE OF DURESS

In his third and fourth issues, appellant contends that the evidence was legally and factually insufficient to support the jury's negative finding on his affirmative defense of duress because his recorded statements to law enforcement proved that the Fields crew threatened to kill him if he did not comply.[11]

### A. Standard of Review

We may review a finding rejecting an affirmative defense for both legal and factual-sufficiency. *Butcher*, 454 S.W.3d at 20; *Matlock*, 392 S.W.3d at 668–70; *see*

---

[11] This argument is similar to appellant's argument above that he lacked the requisite intent to participate in the combination because he was coerced. But duress is an affirmative defense, meaning it is a plea in confession and avoidance. *Gomez v. State*, 380 S.W.3d 830, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Juarez v. State*, 308 S.W.3d 398, 402 (Tex. Crim. App. 2010)). The confession-and-avoidance doctrine requires the defendant first to admit he "engaged in the proscribed conduct" by admitting to all elements of the underlying offense, including the culpable mental state, and then to claim that his commission of the offense was justified because of other facts. *Id.*; *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007). We might well question whether appellant was entitled to a jury charge on the affirmative defense of duress, given that he denied and continues to deny having had the culpable mental state required for engaging in organized criminal activity. But the State did not object to the jury charge and neither party raises the issue in their briefing. We will therefore address the sufficiency of the evidence supporting duress without reference to appellant's entitlement to the defense.

–22–

*also Moreno v. State*, No. 05-18-00271-CR, 2020 WL 5887011, at *1 (Tex. App.—

Dallas Oct. 5, 2020, pet. ref'd) (mem. op., not designated for publication) ("Unlike

criminal convictions that are only subject to legal sufficiency review, we may review

a finding rejecting an affirmative defense for both legal and factual sufficiency.").

When a defendant challenges the legal sufficiency of the evidence supporting

the jury's rejection of an affirmative defense, we examine the record for any

evidence that supports the jury's negative finding while ignoring all evidence to the

contrary, unless a reasonable jury could not. *See Matlock*, 392 S.W.3d at 669. If no

evidence supports the jury's negative finding, we examine the entire record to

determine whether the evidence establishes the issue as a matter of law. *Id.* A jury's

finding on a defendant's affirmative defense should be overturned for lack of legally

sufficient evidence only if the evidence, viewed in the light most favorable to the

verdict, conclusively proves the affirmative defense and no reasonable jury was free

to think otherwise. *Id.* at 670; *see also Brooks*, 323 S.W.3d at 899.

In a factual-sufficiency review of a finding rejecting an affirmative defense,

and unlike in a legal-sufficiency review, courts examine the evidence in a neutral

light. *Matlock*, 392 S.W.3d at 671. A finding rejecting a defendant's affirmative

defense cannot be overruled unless, "after setting out the relevant evidence

supporting the verdict, the court clearly states why the verdict is so much against the

great weight of the evidence as to be manifestly unjust, conscience-shocking, or

clearly biased." *Id.*

## B. Applicable Law

To establish the affirmative defense of duress, a defendant must prove by a preponderance of the evidence that he committed the offense because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another. TEX. PENAL CODE ANN. § 8.05(a). Compulsion "exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id.* § 8.05(c); *Edwards v. State*, 106 S.W.3d 833, 843 (Tex. App.—Dallas 2003, pet. ref'd).

"'Imminent' means something that is immediate, something that is going to happen now." *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. dism'd, untimely filed) (citing *Dewalt v. State*, 307 S.W.3d 437, 454 (Tex. App.—Austin 2010, pet. ref'd)). "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm, in other words, when a 'split-second decision' is required without time to consider the law." *Id.* (quoting *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd)). Imminence "has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately." *Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Devine v. State*, 786 S.W.2d 268, 270–71 (Tex. Crim. App. 1989); *Anguish v. State*, 991 S.W.2d 883, 886 (Tex. App.—Houston [1st Dist.] 1999, pet.

ref'd)); *see also Ramirez v. State*, 336 S.W.3d 846, 851 (Tex. App.—Amarillo 2011, pet. ref'd). Imminent harm must be shown by affirmative evidence. *Darty v. State*, 994 S.W.2d 215, 218–19 (Tex. App.—San Antonio 1999, pet. ref'd). A threat of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence. *Ramirez*, 336 S.W.3d at 851–52; *Anguish*, 991 S.W.2d at 886. The defense of duress is not available "if the actor intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." TEX. PENAL CODE ANN. § 8.05(d). Also, evidence of a generalized fear of harm is not sufficient to raise the issue of imminent harm. *Brazelton v. State*, 947 S.W.2d 644, 648 (Tex. App.—Fort Worth 1997, no pet.). If undisputed facts indicate a complete absence of immediate necessity or imminent harm, then a defendant's sincere belief that his conduct is immediately necessary to avoid imminent harm is unreasonable as a matter of law. *Dewalt*, 307 S.W.3d at 454.

### C. Application of Law to Facts

Appellant argues that the jury "did not act rationally in rejecting his defense of Duress" and urges us to reverse and render a verdict of not guilty. We disagree and decline to do so.

In his interviews with law enforcement, appellant recounted the events leading up to S.R.'s kidnapping and murder. But, as noted above, appellant's statements to law enforcement were inconsistent. In the July 1 interview, appellant denied any involvement in the kidnapping and murder. In the July 3 interview, appellant

–25–

continued denying involvement, saying, "I'm not kidnapping nobody. That's something *everybody* know. I'm not kidnapping, I'm not shooting nobody, that's not my line of work." (emphasis in original). In response to the interviewers' suggestion that appellant became involved because his friend Titus needed his help, appellant balked, saying: "My partners can't peer pressure me into none of that, bro like. You can't peer pressure me bro. You in a jam, I'll help you get some money, try and get some money . . . but kidnapping!? Come on. No, bruh. No. No. That's something I will not do. I will not, come on, no. I'm not taking no little girl." Also in the July 3 interview, Appellant told officers that he learned of S.R.'s kidnapping and murder when Titus called him asking for help. After recounting the details of his conversation with Titus, appellant said: "That is everything he told me. I don't know why he did, I ask myself, I question, I wish he was still alive so I can ask him; 'why you do?' He knew he was going away for a long time. He knew he was going, I tried to talk to him: 'Like, bitch, lie on the stand bruh. You were forced, bruh. You were forced. You can't, you can't, can't blame yourself.'" In his final interview on July 7, appellant admitted his involvement, including attending the meeting with Fields and others after the robbery, surveilling Perkins's girlfriend's workplace, and serving as a lookout for the kidnapping. But the depth of appellant's involvement was not the only aspect of his story that changed; he was now claiming he acted under duress.

The recorded statements contain several instances of appellant detailing what he believed were threats on his life from the time of the robbery to the time of the murder. In the July 3 and 6 interviews, appellant said that Owens, believing that appellant and Titus were involved in the robbery, threatened to kill them both. Asked why he did not just leave, appellant said, "[i]f we leave, we die." In the July 7 interview, appellant described the pressure he felt from the Fields crew, explaining: "We have to do what they say, like, k the whole time it was me and Mike T[itus], me and Mike T's name the whole time like they gonna kill us." Appellant believed that if he or Titus said the wrong thing at any point, they would both be "popped." Appellant said that when Titus told him about killing S.R., he replied, "bro, we not in the wrong. Like they got us against our wills, fam. They got us at gunpoint. Like we at gunpoint fam. Like they threaten to kill us, fam." He said that when Owens returned appellant's girlfriend's car, Owens threatened him: "You say something; I know where your mama stay; I know where your sister stay; I know where your kids stay."

In our legal-sufficiency review, viewing the evidence in the light most favorable to the verdict means that we must "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899. Here, appellant's interviews with law enforcement constituted the only evidence regarding the threats appellant claimed to have received from the Fields crew. Given the

inconsistencies in appellant's statements, the State put appellant's credibility directly in issue. In addition to the inconsistencies in appellant's statements, the State argued that two of his statements undermined his duress defense. First, appellant relayed to officers that when Titus informed him about killing S.R., appellant told Titus to "lie on the stand" and say he was "forced." Second, appellant told officers that if one of his friends were in a bind, he might help them make some money, but they could not "peer pressure" him into kidnapping someone. The State argued that these admissions show appellant was a willing participant in the kidnapping and his current defense of duress was concocted for the trial. In order for us to conclude that the evidence was legally insufficient to support the jury's negative finding, we would have to find that, despite the jury's verdict, appellant's statements were credible. This we cannot do. *See Brooks*, 323 S.W.3d at 899; *Matlock*, 392 S.W.3d at 670 ("If the record reveals evidence supporting the defendant's position . . ., but that evidence was subject to a credibility assessment and was evidence that a reasonable jury was entitled to disbelieve, we will not consider that evidence in our matter-of-law analysis."); *see also Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018) ("An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence."). We conclude that the evidence was legally sufficient to support the jury's negative finding as to appellant's duress defense.

In our factual-sufficiency review, although we must view the evidence in a neutral light, we "may not usurp the function of the jury by substituting [our]

judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Matlock*, 392 S.W.3d at 671. Because appellant's recorded statements were the only evidence supporting his duress defense, his factual-sufficiency challenge suffers the same fate as his legal-sufficiency challenge. But even if we found appellant's recorded statements to be credible, we cannot say that the jury's verdict was against the great weight of the evidence, because the threats appellant claims he received were not the type contemplated by the statutory definition of duress. For example, the threats on appellant's life immediately after the robbery were made when Owens labored under the mistaken belief, according to appellant, that appellant was involved in the robbery. These threats were not "predicated on appellant's failure to commit" kidnapping and murder, because the strategy to commit those offenses had not yet been planned when said threats were made. *See Cormier*, 540 S.W.3d at 190. Likewise, statements such as "if we leave, we die" and "the whole time like they gonna kill us" constitute "evidence of a generalized fear of harm" and are thus insufficient to support a claim of duress. *See Brazelton*, 947 S.W.2d at 648. Even the most direct threat appellant recounted receiving—Owen's threat that he knew where appellant's family lived—was insufficient to support duress. According to appellant, Owens made that threat to prevent appellant from "snitching," not to coerce him into committing the offenses. *Cf. Comier*, 540 S.W.3d at 190. Moreover, it was not a threat of *imminent* harm, but rather a vague reference to harm that Owens intended to commit at some point in the

–29–

future. *Cf. Ramirez*, 336 S.W.3d at 851–52; *Anguish*, 991 S.W.2d at 886. Our review of the record reveals no other threats recounted by appellant that meet the requisite elements of immediate necessity and imminent harm. *See Dewalt*, 307 S.W.3d at 454. We conclude that appellant's own statements constituted factually sufficient evidence to support the jury's negative finding of duress.

We overrule appellant's third and fourth issues.

## III. MOTION TO SUPPRESS STATEMENTS MADE TO LAW ENFORCEMENT

In his fifth issue, appellant argues that the trial court erred in denying his pre-trial motion to suppress recordings of his interviews with law enforcement officers. The State contends that appellant waived this issue by stating he had "no objection" to the evidence when it was offered at trial. We agree with the State.

An adverse ruling on a pretrial motion to suppress evidence will generally suffice to preserve error for appeal, and a defendant need not specifically object to the evidence when it is later offered at trial. *Thomas v. State*, 408 S.W.3d 877, 881 (Tex. Crim. App. 2013). However, if the defendant affirmatively states that he has "no objection" to the evidence when it is offered at trial, he waives his complaint about the previously preserved error. *Id.* Application of this "no objection" waiver rule is not inflexible or automatic, but depends on the context. *Id.* at 885; *see also Stairhime v. State*, 463 S.W.3d 902, 906 (Tex. Crim. App. 2015). When assessing whether a statement of "no objection" waives a previously preserved error, we first ask whether "the record as a whole plainly demonstrates that the defendant did not

intend, nor did the trial court construe, his 'no objection' statement to constitute an abandonment of a claim of error that he had earlier preserved for appeal." *Stairhime*, 463 S.W.3d at 906. If after reviewing the entire record, "it remains ambiguous whether waiver was intended, the court should resolve the ambiguity in favor of a finding of waiver." *Id.* Under those circumstances, "the affirmative 'no objection' statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood." *Thomas*, 408 S.W.3d at 885–86.

Appellant filed his motion to suppress on December 17, 2019, and the trial court held a hearing on the motion the next day. At the end of the hearing, appellant's counsel stated that he intended to file a brief in support of the motion explaining the grounds for excluding the evidence. On January 7, 2020, Appellant filed his brief in support of the motion, advancing the arguments he now makes on appeal, including that his statements: were the result of an improper two-step interrogation, were tainted by prior confessions, violated his Sixth Amendment right to counsel, were coerced under death-penalty threats, and were not visually recorded pursuant to Article 38.22 of the Code of Criminal Procedure. On February 18, 2020, the first day of trial, the trial court briefly addressed outstanding motions before the jury venire was called in for voir dire. This exchange took place:

> THE COURT: Oh, I'm sorry. Yes, the State has filed a motion to strike some language in the indictment which was granted.
>
> The Defense has filed a Motion to Quash which is denied.
>
> And, Mr. Fishburn, you wanted me to rule on your Motion to Suppress?

MR. FISHBURN: I wanted to put something on the record on the Motion to Quash, if I may.

THE COURT: You may.

MR. FISHBURN: We maintain that the indictment as amended fails in two relative respects. Although allegedly they exist in a combination, it does not describe the combination. The indictment alleges two predicate crimes, murder and --

COURT REPORTER: Alleges two what?

MR. FISHBURN: Predicate crimes, murder and aggravated kidnapping. As such, the indictment fails to describe the combination as required; and by alleging two predicate crimes, it fails to show an ongoing criminal enterprise. It really just shows two ad hoc crimes that they committed.

And I've put for the record in the record Arredondo versus State, 270 S.W.3d 676 at 682, Texas App Eastland, 2008, and the cases cited therein.

THE COURT: Thank you. Does the State wish to be heard?

MS. FALK: No, Judge.

THE COURT: Okay. Motion denied.

And your Motion to Suppress that we had earlier is denied.

(Motion to Suppress denied.)

At trial, the State offered the recorded interviews as well as transcripts of each interview into evidence. Appellant stated he had "no objection," and the evidence was admitted for all purposes.

We conclude that, although appellant preserved his challenge to the recorded statements through his motion to suppress, he subsequently waived the issue for appeal. After the trial court denied appellant's motion, appellant did not raise any of

his arguments again and stated he had no objection to the statements being admitted. Appellant has not directed us to any indication in the record that he did not intend to waive this issue. *See Stairhime*, 463 S.W.3d at 906. On the contrary, appellant used the statements to support his affirmative defense of duress.[12] During closing argument, defense counsel argued that appellant "told the truth when he said they made him get in the car. They made me drive around. I couldn't go anywhere. They would have popped me, meaning they would have shot me." Counsel urged the jury to "[r]ead the transcripts and discuss them," and stated they were "all the evidence that you need to decide this case."

The record before us fails to "plainly demonstrate" that waiver was not intended or understood. Appellant's "no objection" thus served as an unequivocal abandonment of his complaint. *Thomas*, 408 S.W.3d at 885–86. We overrule appellant's fifth issue.

## IV. MOTION TO QUASH INDICTMENT

In his sixth issue, appellant contends that the trial court erred in denying his motion to quash the indictment. Specifically, appellant argues that the indictment

---

[12] We note that appellant raised the issue of duress during voir dire, indicating an intent to present evidence on that issue. In pre-trial proceedings, appellant's counsel stated that he intended to call Wilkerson, Owens, Polley, and Fields to testify pursuant to Section 71.04 of the Penal Code. The statute provides that "[a] party to an offense under this chapter may be required to furnish evidence or testify about the offense." TEX. PENAL CODE ANN. § 71.04(a). The statute grants use immunity to any such witness. *See id.* § 71.04(b). Appellant argued that their testimony would be exculpatory to him and would show he was not "a member of the combination, if there was one." The trial court stated that the issue was premature and declined to rule on appellant's request. The issue was not raised again, as appellant did not call any witnesses during his case in chief. Thus, appellant's interviews with law enforcement were the only evidence supporting appellant's affirmative defense of duress.

–33–

was defective for failing to allege facts necessary to show what "combination" he participated in, as a necessary element of the offense charged. *See* TEX. PENAL CODE ANN. § 71.02 ("A person commits an offense if, with the intent to establish, maintain, or participate in a *combination* or in the profits of a *combination* or as a member of a criminal street gang, the person commits or conspires to commit one or more [predicate offenses]." (emphasis added)). The State responds that appellant failed to preserve this issue for review and, alternatively, that the indictment tracked the language of the statute and was therefore not defective. We conclude that appellant has not preserved this issue for review.

A motion to quash an indictment must be made in writing. TEX. CODE CRIM. PROC. ANN. art. 27.10. The purpose of this requirement is two-fold: (1) it assures adequate notice to the state allowing opportunity for either amendment or to prepare for a hearing on the issue; and (2) it preserves the issue for appeal. *State v. Goldsberry*, 14 S.W.3d 770, 775 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Where a written motion fails to adequately inform the trial judge of the defects in the indictment, "the fundamental constitutional protections of adequate notice and due process have not been invoked." *Jones v. State*, 672 S.W.2d 798, 800 (Tex. Crim. App. 1984). Form motions that contain general allegations of inadequate notice are deficient. *See id.* Where a party files a deficient motion but advances specific grounds during oral argument, the specific grounds are not preserved for appeal unless the party amends or modifies the written motion. *See Goldsberry*, 14

S.W.3d at 775 (trial court erred in quashing indictment based on additional grounds raised in oral motion to quash not included in written motion); *State v. York*, 31 S.W.3d 798, 803 (Tex. App.—Dallas 2000, pet. ref'd) (trial court erred in quashing informations based on grounds asserted only in oral motion to quash); *see also Thetford v. State,* No. 02-18-00488-CR, 2021 WL 278913, at *9 (Tex. App.—Fort Worth Jan. 28, 2021, pet. granted[13]) (mem. op., not designated for publication) (where additional grounds were raised in oral motion to quash, "Article 27.10 required [the defendant]—at some point—to modify the motion in writing").

Here, appellant's motion to quash states, in full, that: "Mr. Jones move[s] to quash the indictment because it fails to state an offense under Tex. Penal Code. Ann. section 71.02." Such generic language does not apprise the trial court of the specific grounds for finding the indictment defective. *See Jones*, 672 S.W.2d at 800; *York*, 31 S.W.3d at 803. At a hearing, appellant raised the specific arguments he now urges on appeal. However, appellant did not file an amended or modified motion to quash. We thus conclude that appellant failed to preserve for appeal his specific objections to the indictment. *See Goldsberry*, 14 S.W.3d at 775; *York*, 31 S.W.3d at 803.

We overrule appellant's sixth issue.

---

[13] The court of criminal appeals granted the appellant's petition for discretionary review and remanded the case for consideration of appellant's sufficiency issue, which the court of appeals had originally declined to reach. *See Thetford v. State*, No. PD-0258-21, 2021 WL 2674484 (Tex. Crim. App. June 30, 2021) (per curiam).

## V. OBJECTION TO IMPROPER OPINION

In his final issue, appellant contends that the trial court erred by overruling his objection to testimony by Special Agent Mahan regarding appellant's truthfulness. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *See Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Beham*, 559 S.W.3d at 478; *Gonzalez*, 544 S.W.3d at 370.

The testimony in question came after the State read parts of appellant's recorded interviews into evidence, stopping intermittently to ask Special Agent Mahan questions about the interview. The following is one such exchange:

Q. Was [appellant] jumping around at that point [i.e., in response to interview questions]?

A. Yes.

Q. Tell us how so.

A. He -- as I spoke to you yesterday, the reason why you do very detailed oriented interviews is that's how you can determine people are lying. So when you're getting him to point on details, that is when he was -- you know, he was trying to get his story straight.

Q. Okay. Have you like been to classes on interrogation and deception techniques and picking up on cues?

[Appellant's Counsel]: Objection. He's not been qualified as an expert in this.

THE COURT: Overruled.

Q. [Counsel for the State:] So just more so than an average person, part of your job is continuing training, right?

A. That is correct, yes.

Q. And how would you describe [appellant's] responses to a lot of the -- well, let me ask it in a more particular way. Does [appellant] repeat back the question you ask often?

A. Yes.

Q. Does [appellant] repeat himself often?

A. Yes.

Q. What is one reason that a suspect may do those two things during an interrogation?

[Appellant's Counsel]: Objection to the question. He's not qualified as an expert to tell a jury whether any witness is lying or telling the truth.

THE COURT: Overruled.

A. So based on my training and experience and having interviewed multiple people, numerous people, typically when someone asks --

[Appellant's Counsel]: Objection. Now it's nonresponsive.

THE COURT: Overruled.

A. Typically that is a technique that they use because they're trying to get their story straight. They need a couple more seconds to formulate their response. Typically used by people that are being deceptive.

Q. [Counsel for the State:] In parts of this statement [appellant] is probably telling the truth, right?

A. Yes, he tells the truth, and he tells lies.

Appellant argues that Detective Mahan's opinion as to appellant's truthfulness was inadmissible expert testimony.

Generally, evidence showing that an accused was deceptive during an investigation is relevant and admissible. *Brown v. State*, 580 S.W.3d 755, 765 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (citing *Oliva v. State*, 942 S.W.2d 727, 732 (Tex. App.—Houston [14th Dist.] 1997, pet. dism'd)). "However, an expert is not permitted to give a direct opinion on the truthfulness of a witness." *Id.* (citing *Yount v. State*, 872 S.W.2d 706, 709–10 (Tex. Crim. App. 1993)). Also inadmissible is a witness's expert opinion on the truthfulness of a criminal defendant during an investigation. *See id.* (citing *Gonzalez v. State*, 301 S.W.3d 393, 398 (Tex. App.—El Paso 2009, pet. ref'd) (concluding that testimony of expert was impermissible opinion on truthfulness of defendant's statement)). The rule applies equally to expert and lay witness testimony. *See Blackwell v. State*, 193 S.W.3d 1, 21 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

Here, the State did more than simply elicit testimony that appellant was untruthful during the investigation. *Cf. Brown*, 580 S.W.3d at 765; *Oliva*, 942 S.W.2d at 732. The State's questions to Special Agent Mahan were couched in terms of his experience and training. Such questions go directly to expert qualifications. *See* TEX. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."). Assuming that the State intended to establish Special Agent Mahan's expertise in lie detection, we

need not decide if the State was successful. Special Agent Mahan's opinion as to appellant's truthfulness was inadmissible irrespective of his status as a lay or expert witness. *See Blackwell*, 193 S.W.3d at 21. We conclude the trial court erred in overruling appellant's objection.

That is not the end of the inquiry, however—we must determine whether the error was harmful. Appellant argues that the error should be construed as harmful because it violated "his right to due process and a fair trial." The State responds that, to the extent the trial court erred, the error was harmless. We agree with the State.

Improper admission of evidence is non-constitutional error that we disregard unless the error affects an appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). Under Rule 44.2, "an appellate court may not reverse for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict." *See Garcia*, 126 S.W.3d at 927. A trial court's error due to improper admission of evidence may be rendered harmless if other evidence is admitted without objection and it proves the same fact or facts that the inadmissible evidence sought to prove. *See Mack v. State*, 928 S.W.2d 219, 225 (Tex. App.—Austin 1996, writ ref'd) (improper admission of evidence not harmful error if same or similar evidence admitted without objection); *see also Valle v. State*, 109 S.W.3d 500, 509 (Tex.

Crim. App. 2003) (error in admission of evidence is cured where same evidence comes in elsewhere without objection).

In determining the likelihood that the jury's decision was improperly influenced, we may consider, among other things: (1) the strength of the evidence of the defendant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during arguments. *Sandoval v. State*, 409 S.W.3d 259, 293-94 (Tex. App.—Austin 2013, no pet) (citing *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010)). "Even in cases in which credibility is paramount, Texas courts have found harmless error when the inadmissible expert testimony was only a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility." *Brown*, 580 S.W.3d at 766 (quoting *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011)).

Applying the factors, we conclude that Special Agent Mahan's testimony had at most a slight effect on the jury. As to the first factor, we have already explained why the evidence was more than sufficient to support the jury's verdict. To summarize, the evidence was sufficient for the jury to conclude that appellant participated in the planning, execution, and coverup of the kidnapping and murders. The first factor weighs against a finding of harm.

As to the second factor, the challenged testimony above was not the first time the State elicited Special Agent Mahan's opinion as to appellant's truthfulness. In earlier testimony, the State asked about inconsistencies in appellant's interviews. This exchange followed:

A. Just -- he would say things and then later on in the interview, the statements would not match up with what he told me previously. So just -- you know, I'm always -- anytime I talk to somebody, I always think the devil is in the details, so I'm a very detailed-oriented interviewer. So when those details don't match up during the course of the interview, I know that somebody is lying to me, typically.

Q. And in this situation, specifically your conversations with Mr. Jones, it's not only just the [*sic*] during the course of one interview, it's during the course of multiple interviews, correct?

A. That's correct.

Q. And would it be fair for me to characterize – some of them are just outright lies?

A. Absolutely.

Q. Right. And we know that, because later he would admit that he lied about -- you know, maybe what he told you or told y'all Saturday, July 1st, or Monday, July 3rd, compared to what he finally tells you on July 7th?

A. Yes. Typically with him when we interviewed him, each interview brought out a little bit more truth. It was -- you know, to be frank, a very frustrating interview because you know he knew more than what he was telling. So every time I went in there, it was -- it was a lot of work to try and get those details out of him.

Q. And on Friday, July the 7th, were you able to get the -- the most amount of details and kind of the biggest admission of involvement in this case from him?

A. Yes.

Q. All right. Prior to July 7th, he had kind of been like, I don't know anything, my people might know something, and then more and more would be added to that involvement, right?

A. That -- that is correct.

Q. Is it common for suspects to minimize their own involvement in a case?

A. Yes.

Similar to the testimony quoted above, this testimony relayed inadmissible opinion evidence as to appellant's dishonesty, bolstered by Special Agent Mahan's training and experience. Unlike the testimony above, however, appellant did not object to this testimony. The second factor weighs against a finding of harm. *See Valle*, 109 S.W.3d at 509; *Mack*, 928 S.W.2d at 225.

Regarding the third factor, although Special Agent Mahan's opinion was strong, it could not be easily refuted. Transcripts of the interviews were submitted to the jury without objection,[14] and the inconsistencies in appellant's statements were readily apparent. Over the course of the interviews, appellant's story went from portraying himself as completely uninvolved, to suggesting Titus was still alive, to knowing some details about the kidnapping but suggesting Titus may have killed himself, to being a lookout for the kidnapping, to being present (though outside the house) when Titus was murdered. Even then, the jury could conclude that appellant's

---

[14] In its closing argument, the State said: "We made a decision not to play every single video, but you have them. You have the transcripts. Y'all can sit back there and read them if you want to. But you can go back there and decide [appellant's] credibility. Was he credible? Did he have a motive to lie? Did he have a motive to lie? Did he have a motive at the beginning to minimize his role?"

final admission was itself not completely truthful, given that forensic evidence revealed gunshot residue on appellant's clothing. The third factor weighs against a finding of harm. *See Brown*, 580 S.W.3d at 767 (third factor weighed against harm where jury could conclude from the evidence that the testifying officer did not find the defendant credible).

Regarding the fourth factor, we note that the State did not mention Special Agent Mahan's opinion in closing argument.[15] Additionally, the jurors were instructed that they were "the exclusive judges of the credibility of the witnesses and the weight to be given their testimony." The fourth factor weighs against a finding of harm. *See id.* (fourth factor weighed against harm where the State did not mention officer's opinion on the defendant's credibility during summation and the jury was instructed it was the sole judge of the witness' credibility).

Having examined the factors, we conclude that, in the context of the entire record, the trial court's admission of Special Agent Mahan's testimony regarding

---

[15] The State did, however, argue in summation that appellant was not credible. That argument was not based on Special Agent Mahan's opinion, but rather an inference from the evidence. *See Cargill v. State*, No. AP-76,819, 2014 WL 6477109, at *15 (Tex. Crim. App. Nov. 19, 2014) (citing *Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App. 1993)) (prosecutors may comment on the merits of the defense's argument and the defendant's credibility as a witness); *see also, e.g.*, *Day v. State*, No. 05-99-00368-CR, 2001 WL 1674224, at *10 (Tex. App.—Dallas Jan. 4, 2002, pet. ref'd) (mem. op., not designated for publication) (statements during closing argument pointing to inconsistencies in accused's statements to law enforcement were reasonable inferences drawn from the evidence and not harmful).

appellant's credibility did not have a substantial and injurious effect or influence on the jury's verdict.

We overrule appellant's seventh issue.

## VI.    REFORMATION OF JUDGMENT

In a cross-issue, the State asks us to reform the judgment to reflect that the jury, not the trial court, assessed punishment. A judgment is "the written declaration of the court signed by the trial judge and entered of record showing the conviction or acquittal of the defendant." TEX. CODE. CRIM. PROC. ANN. art. 42.01, § 1. If the defendant has been found guilty, the judgment must state the defendant's punishment "in accordance with the jury's verdict or the court's finding." *Id.* § 1(8). This Court "has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so." *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd); *accord Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Abron v. State*, 997 S.W.2d 281, 282 (Tex. App.—Dallas 1998, pet. ref'd); *see also* TEX. R. APP. P. 43.2(b) (court of appeals may "modify the trial court's judgment and affirm it as modified").

Here, the judgment contains a fillable space under the heading, "Punishment Assessed by," which is filled in with "Court." The record reflects that the issue of punishment was submitted to the jury. The judgment is therefore incorrect and should be reformed.

We sustain the State's cross-issue and modify the judgment to reflect that the jury assessed punishment.

## CONCLUSION

We decline to conduct a factual sufficiency review of appellant's conviction. We conclude that: (1) the evidence was legally sufficient to support appellant's conviction under the standard set forth in *Jackson v. Virginia*; (2) the evidence was factually and legally sufficient to support the jury's negative finding on duress; (3) appellant waived the complaint raised in his motion to suppress; (4) appellant failed to preserve error with respect to his motion to quash; and (5) the trial court erred in overruling appellant's objection to credibility testimony but the error was harmless. We sustain the State's cross issue and modify the judgment to reflect that the jury, not the trial court, assessed punishment. As modified, we affirm the trial court's judgment.


/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

Do Not Publish
Tex. R. App. P. 47.2(b)
200304F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

DESMOND ARMOND JONES,
Appellant

No. 05-20-00304-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F-1900479-W.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

In the trial court's Judgment of Conviction by Jury, under the heading "Punishment Assessed by," we **REMOVE** the word "COURT" and **INSERT** "JURY" in its place.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered September 22, 2022